### In re CHESTER J.

#### No. 99–112–Appeal.

Supreme Court of Rhode Island.

July 12, 2000.

Thomas J. Corrigan, Jr., Providence, Frank P. Iacono, Jr., for Plaintiff.

Paula Rosin, Providence, Frances K. Munro, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

This case came before the Court on the appeal of Carla Smith (Carla or mother), and Chester Jackson, III (Jackson or father), from a decree of the Family Court granting the petition of the Department of Children, Youth and Families (DCYF) to terminate any and all legal rights of Carla and Jackson in their child, Chester J. (C.J.). The parties were directed to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and examining the memoranda submitted by the parties, we are of the opinion that cause has not been shown. Therefore, we shall decide the case at this time.

### Facts and Procedural History

This is a case of horrific child abuse and neglect that came to light when C.J. was less than seven months old. C.J. was born on August 23, 1997. His mother, Carla, and his father, Jackson, were both seventeen years old at the time. On March 17, 1998, Deborah Lowen, M.D., (Dr. Lowen), a pediatrician and member of the Child Protection Team at Hasbro Children's Hospital, was notified by the emergency department that there was an infant whose x-ray revealed multiple fractures of varying ages. Before treating C.J., Dr. Lowen learned that C.J. had gone to his regular pediatrician, Dr. Toll, for his routine six-month checkup. Doctor Toll's evaluation of C.J., which revealed that C.J.'s liver was slightly enlarged, led Dr. Toll to refer C.J. to Hasbro Children's Hospital for an abdominal ultrasound and a skeletal survey. It was the results of these tests that first brought Dr. Lowen into contact with C.J.

After reviewing the lab results, the x-rays, and the abdominal ultrasound, Dr. Lowen made numerous findings indicating child abuse, including that C.J. had suffered multiple fractures of various ages throughout his body. In her testimony concerning those fractures, Dr. Lowen stated that C.J. had recent fractures of the left sixth and seventh ribs, with soft tissue swelling over these new fractures. Also, Dr. Lowen testified that C.J. had healing fractures of both the left and right tenth

ribs, as well as the right eighth rib. Further, she noted that the right ninth rib had an older fracture and that the left tibia and ulna bones had evidence of healing fractures. In addition, the left and right radius bones showed old fractures that were well in the process of healing. Doctor Lowen also suspected another new rib fracture, and her suspicions were confirmed following a subsequent x-ray.

Doctor Lowen further testified that although the abdominal ultrasound revealed no acute trauma to either the liver or the spleen, it did reveal the presence of fluid in C.J.'s abdominal cavity, an abnormal finding. Doctor Lowen was concerned that the elevated liver tests, the enlarged liver, and the fluid in the abdomen were suggestive of trauma to C.J.'s abdomen, and that there may have been a more severe underlying injury that had not been observed. Doctor Lowen's fears would soon be confirmed.

Doctor Lowen also testified about numerous bruises and lesions of various ages covering C.J.'s body. Specifically, she testified that C.J. had bruises consistent with adult bite marks on both his hip and his arm that were three to four days old. Also, there were bruises on his left temple, above the left eyebrow, and possibly one on the right temple. There were multiple red lesions on C.J.'s cheeks, temple and ear, and there were also brown spots on his cheeks and temple. Further, Dr. Lowen testified that C.J.'s overall hygiene was "very, very poor." Specifically, Dr. Lowen noted that his hair was dirty, his fingernails and toenails were very long and dirty, his clothes were filthy, and "he was in dire need of a bath."

In addition, it was determined that C.J.'s growth since birth had fallen, and he was medically classified as "failing to thrive," which Dr. Lowen testified was a lack of appropriate weight gain in an infant, or an actual loss of weight over a certain month or number of months. Specifically, when C.J. was born, and again when he was six weeks old, he was in the 75th to 90th percentile; when he was six-and-a-half months old, his weight was in the tenth percentile, indicating that 90 percent of the children in C.J.'s age group weighed more and possessed a better head circumference than he did.

Doctor Lowen also considered the parents' history involving C.J.'s care. Although C.J. had numerous caretakers, the parents were his primary caretakers. Doctor Lowen testified that she spoke with the parents about C.J.'s injuries, but received no adequate explanation for the extensive trauma that C.J. had suffered. The parents denied any history of trauma, but suggested that C.J. was an active sleeper who may have suffered the bruises in his crib because he would pull his crib bumper down and roll into the crib bars. Also, the parents alleged that a bouncy ball struck C.J. in the face, causing the bruising. Doctor Lowen discounted these explanations, finding that they were inconsistent with the nature of the injuries, and concluded that neither C.J.'s crib nor his toy could have caused such extensive trauma.

Doctor Lowen concluded that these numerous ghastly injuries, including the fractures, bruises and bruised liver, were the result of child abuse involving non-accidental injury, and that C.J.'s failure to thrive and exceedingly poor hygiene were evidence of child neglect. As a result, on March 17, 1998, she ordered that no family members have unsupervised contact with the child in the hospital. Both the police and DCYF were notified of her conclusions.

C.J. was discharged into foster care on March 27, 1998, after spending ten days in the hospital. However, C.J.'s ordeal was far from over. Approximately five days later, C.J. was again brought into the emergency unit of Hasbro Children's Hospital, and was subsequently readmitted. Doctor Lowen testified that C.J. came into the emergency department in mild to moderate shock, that he was vomiting and that

he had developed significant abdominal distention. A needle was inserted into C.J.'s abdomen, and a significant amount of fluid was removed that had chyle, or lymphatic fluid, thus confirming Dr. Lowen's earlier fears. Doctor Lowen explained that lymphatic fluid is transported from the abdomen up to the heart, and when this occurs in a child or infant, there is concern about whether there is a congenital problem or trauma. A subsequent gastrointestinal series,[1] as well as additional examinations throughout the course of his hospitalization and as an outpatient, revealed that the condition was not the result of a congenital defect, but was rather a rare case of where the chyle in the abdomen was caused by trauma. Doctor Lowen noted that the trauma had occurred before her evaluation of C.J. on March 17, 1998, and that in the few reported cases where trauma caused this condition in children, all these reports indicated child abuse as the cause. Doctor Lowen, taking into account the fractures, bruises and previous blunt trauma, concluded that C.J.'s condition was indeed the result of child abuse. Four new rib fractures were also discovered on April 2, 1998, that previously were difficult to detect until there was a calcium buildup at the site of the fracture. After a twenty-five-day hospitalization, C.J. was discharged for the second time, on April 27, 1998.

The DCYF social worker assigned to the case, Rachel Arpin (Arpin), testified about the squalor in which C.J. lived. The trial justice noted that Arpin described C.J.'s crib as "extremely filthy with blood stains on his dirty sheets." Also, she noted that drugs and drug paraphernalia were found in the house. In addition, Arpin testified that Carla asked to speak with her to share her suspicion that it was Jackson who had abused C.J. However, Arpin testified that Carla had no evidence to support her allegation. At trial, Carla testified that she no longer believed that Jackson was responsible for C.J.'s injuries, but rather she believed that Jackson's mother, Rosa Jackson, who sometimes cared for C.J., had caused the injuries. Jackson testified that he had mixed feelings about whether his mother was responsible for C.J.'s dreadful ordeal.

On March 19, 1998, DCYF filed the first of two Family Court petitions.[2] The first petition alleged six counts of child neglect and abuse: (1) that the parents have failed to provide C.J. with a minimum degree of care, supervision, or guardianship; (2) that C.J. is without proper care and supervision; (3) that the parents have inflicted or allowed to be inflicted upon C.J., physical injury; (4) that the parents have inflicted on C.J. physical injury, including excessive corporal punishment; (5) that the parents have created or allowed to be created a substantial risk of physical injury to C.J.; and (6) that the parents have created or allowed to be created a substantial risk of physical injury to C.J., including excessive corporal punishment. The second petition, filed on April 21, 1998, sought the involuntary termination of Carla's and Jackson's parental rights. It alleged that the parents committed or allowed to be committed conduct toward any child of a cruel and abusive nature and that they abandoned and/or deserted the child.[3] Both petitions were consolidated for trial.

After a seven-day trial during October and November of 1998, the trial justice issued a written decision terminating Carla's and Jackson's parental rights in C.J. Both parents testified and reiterated their unwavering and joint denial of responsibility. A decree was entered on January 22,

1. As is the procedure for undergoing an upper gastrointestinal series, C.J. was given a barium enema to evaluate for a mal rotation of his gut.

2. The two petitions are numbered 98-3-580 and 98-4-667, respectively.

3. The Department of Children, Youth and Families subsequently dismissed the abandonment allegation.

1999, in which the trial justice made numerous findings of fact. The trial justice found that the parents were in the position of co-primary caretakers of C.J., and that both expressed "complete and total ignorance of how the child's horrific injuries were inflicted." The trial justice found that neither Carla nor Jackson seemed aware or alarmed at the bruises or bite marks, "though it would have been impossible to bathe or change the child without noticing the marks or filth on him ." Also, the trial justice found the testimony by both Carla and Jackson to be self-serving and not credible. Finding that both parents were involved in a "conspiracy of silence," the trial justice concluded that either parent or both of them were responsible for C.J.'s injuries. In addition, the trial justice found no independent evidence to support Carla's and Jackson's contention that the paternal grandmother was responsible for the child's injuries. Further, the trial justice found that C.J. had not been bathed, was unclean, and had suffered traumatic injuries, and that the responsibility for these conditions fell on the primary caregivers, in this case the parents. As a result, the trial justice found that DCYF was not obligated to offer services designed to reunify C.J. with his parents, and concluded that the allegations in both petitions were proven by clear and convincing evidence. A timely appeal was filed by both parents.

## Standard of Review

When reviewing cases involving the termination of parental rights, this Court examines the record to determine whether legally competent evidence exists to support the trial justice's findings. *See In re Ryan S.*, 728 A.2d 454 (R.I.1999). "Such findings are entitled to great weight, and this Court will not disturb them on appeal unless the findings are clearly wrong or the trial justice misconceived or overlooked material evidence." *Id.* at 457 (citing *In re Kristen B.*, 558 A.2d 200, 204 (R.I.1989)).

## Discussion

On appeal, Carla conceded that DCYF is not obligated to make reasonable efforts to reunify a parent and child when the parent has engaged in "conduct * * * of a cruel and abusive nature." G.L.1956 § 15-7-7(a)(2)(ii); § 15-7-7(b)(1), as amended by P.L.1999, ch. 122, § 3; *see also In re Nicole B.*, 703 A.2d 612, 617 (R.I.1997) ("when the termination petition alleges parental conduct of a 'cruel and abusive nature,'" reasonable efforts are not required). Jackson contended that it was error for the trial justice to hear the abuse and neglect petition and the termination petition at the same proceeding, a contention we deem to be without merit because, at the time of trial, Rule 21 of the Family Court Rules of Juvenile Proceedings allowed the Family Court to "order two (2) or more petitions to be tried together."

Further, Carla argued that to grant a petition seeking the termination of parental rights on the grounds of cruel or abusive conduct toward the child, the Family Court must find that it was the parent who actually inflicted the abuse. Section 15-7-7 states, in part, that:

"**Termination of parental rights.**—(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and hearing thereon, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as fact, by clear and convincing evidence that:

" * * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

" * * *

(ii) Conduct toward any child of a cruel or abusive nature."

Carla contended that "conduct" is defined as "the act, manner, or process of carrying out (as a task)," and therefore the statute is aimed at the parent who carries out or inflicts the abuse. We disagree. First, we note that the language of § 15–7–7 specifically states that DCYF, upon a finding that a parent is unfit by either conduct or conditions seriously detrimental to the child, may make allegations in the termination petition not embodied in § 15–7–7(a)(2). Here, DCYF alleged that the parents "committed or allowed to be committed conduct toward [the] child of a cruel and abusive nature." The trial justice therefore was correct in finding "that the language contained in the present petition for Involuntary Termination of Parental Rights meets the requirements of the law."

Further, in *In re Frances*, 505 A.2d 1380 (R.I.1986), this Court upheld a termination decree where there was no direct evidence that the mother had injured the child. We rejected the mother's argument that the evidence was inadequate to show that she inflicted the abuse, noting that this argument "ignores the obvious inferences to be drawn from the evidence in the record." *Id.* at 1384. The facts in *In re Frances* demonstrated that the mother was the primary caregiver, that there were numerous unexplained injuries in various stages of healing, and that the mother gave inconsistent histories to the police and physicians. *Id.* at 1384–85. This Court stated that "[i]t was reasonable for the trial justice to conclude on the basis of the evidence before him that a loving, caring parent would have known the source of the injuries and would have reported this information * * * if she had not caused them herself *or permitted them to happen*." *Id.* at 1385. (Emphasis added.) We agreed with the trial justice that there was clear and convincing evidence to support the termination petition, and concluded that the decision of the trial justice was fully justified. *Id.* "The state, under the scrutiny of the court, need not wait until a child's life has been permanently and irretrievably impaired before acting." *Id.* (quoting *In re Lester*, 417 A.2d 877, 881 (R.I.1980)).

The facts of the instant case are tragically similar to *In re Frances*. The evidence established that Carla and Jackson were C.J.'s primary caregivers, who were unable or unwilling to adequately explain the massive trauma suffered by this infant. C.J. had no fewer than nine rib fractures of various ages, indicating that they were incurred over a sustained period. In addition, C.J. suffered fractures of the left tibia, left ulna, left radius and the right radius. Further, C.J. had multiple bruises about his head, multiple lesions on his face, numerous other abrasions and bruises, a bite mark on his right arm, and an adult bite mark on his left hip. The parents could not explain these atrocities inflicted upon one so young, except to say that C.J. had a tendency to roll into the bars of his crib, and that he was hit in the face by a "bouncing ball" on one occasion, explanations discounted by the medical expert and rejected by the trial justice. In effect, the parents expressed complete and total ignorance about C.J.'s injuries, how they were inflicted, and who might be responsible. Carla gave inconsistent accounts about who may have been the culprit. First, she indicated that she thought Jackson was responsible; she then suggested that C.J.'s paternal grandmother inflicted the injuries, a contention about which Jackson had mixed feelings. The tragedy that C.J. was enduring came to light only because the parents took the child to the doctor for his regular checkup, not for what was later discovered to be serious trauma to C.J. caused by child abuse.

We agree with the trial justice that there was clear and convincing evidence to support the petition for termination of parental rights. Drawing inferences from established facts is an elementary tenet of judicial fact-finding. *In re Vannarith D.*, 731 A.2d 685, 688 (R.I.1999) (citing *State v. McKone*, 673 A.2d 1068, 1073 (R.I.1996)). Here, both the quantum and the obscene nature of

the abuse was so overwhelming that the trial justice could not ignore the reasonable inferences to be drawn from the evidence. We are satisfied that the state is not required to prove which parent actually inflicted the abuse. Allowing parents to ignore or to stand by while such abuse and neglect occurs is tantamount to the parents inflicting the abuse themselves for purposes of a termination pursuant to § 15–7–7(a)(2). As the parents and primary caregivers of C.J., "the law holds [them] to a greater level of substantial responsibility and awareness concerning the well-being of their children than it otherwise might in the case of an adult relative or a stranger." *In re Nicole B.*, 703 A.2d at 618. Further, it is clear to this Court that § 15–7–7 should not be interpreted to require reasonable efforts at reunification when the parents permit, rather than inflict, such horrific abuse. In light of these tragic facts and the sad history of C.J.'s first seven months of life, the trial justice did not err in finding the conduct of either Carla or Jackson to be cruel and abusive.[4]

Therefore, because the conduct of Carla and Jackson toward the child was cruel and abusive, as the termination of parental rights petition alleged, the trial justice was correct in refusing to require DCYF to make reasonable efforts to reunify C.J. with his parents. The Legislature has exempted from the requirement that an agency seeking the termination of parental rights must demonstrate that it made reasonable efforts to "encourage and strengthen the parental relationship so that the child can safely return to the family" in cases in which cruel and abusive conduct is the basis for the petition. We further note that the 1999 amendment to § 15–7–7 specifically provides that DCYF has no obligation to engage in reasonable efforts to preserve and reunify the family.[5]

For the foregoing reasons, the parents' appeal is denied. The decree of the Family Court terminating their parental rights is affirmed. The papers of this case may be remanded to the Family Court.

---

4. The words of the trial justice are particularly telling and true: "Sleep well, C.J. you will not be dirty or hurt again."

5. Section 15–7–7, as amended by P.L.1999, ch. 122, § 3.