**Supreme Court**

No. 2014-206-Appeal.
(P12-798-1)

In re Kristopher J.                          :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Kristopher J.                      :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Flaherty, for the Court.** This case is but another example of the great tragedy of child abuse that plagues our society. The respondent-father, Christopher Jimenez, was indicted for inflicting numerous injuries over the span of several weeks on his five-week-old daughter Christina, resulting in the infant's death. In response to the allegations lodged against the respondent with respect to his daughter, the Department of Children, Youth, and Families (DCYF) filed a petition to terminate his parental rights to his other child, a one-year-old son named Kristopher. After an eight-day trial, a justice of the Family Court terminated the respondent's parental rights. The respondent timely appealed. The matter came before the Supreme Court for argument on April 29, 2015, pursuant to an order directing the parties to show cause why the issues raised should not be summarily decided. After hearing the arguments and examining the memoranda filed by the parties, we conclude that cause has not been shown and we shall proceed to decide the appeal at this time. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

# I

## Facts and Travel

On August 23, 2012, DCYF filed a petition to terminate the parental rights of Mayra Gonzalez (Mayra or mother)[1] and respondent-father to their son, Kristopher J. The petition alleged two grounds to support the termination of respondent's rights: (1) "The parents are unfit by reason of conduct or conditions seriously detrimental to the child, in that the parents have committed or allowed to be committed, conduct toward any child of a cruel or abusive nature," and (2) that the father, specifically, was unfit because he committed a criminal act, namely the murder, manslaughter, or assault, of his daughter, Christina. However, because respondent's criminal charges were still pending at the time of trial, DCYF withdrew the second ground during trial.[2]

## Trial on the Petition

In March and April of 2014, a trial was held before a justice of the Family Court. Eight witnesses testified during the trial: respondent, a first responder who treated Christina, a doctor who treated Christina at Hasbro Children's Hospital, a Providence Police detective assigned to Christina's death, three DCYF employees assigned to the family, and Mayra's mother, grandmother to both Christina and Kristopher. At the time of Christina's death, respondent and his girlfriend, Mayra, were the parents to two children, Kristopher and Christina. The respondent

---

[1] Ms. Gonzalez participated in the termination process and was represented by counsel, but she voluntarily consented to the termination of her parental rights at a pretrial hearing on December 17, 2013. The respondent proceeded to trial, and he is the only parent before this Court on appeal.

[2] On April 29, 2015, respondent's counsel represented to this Court that the criminal matter stemming from respondent's alleged involvement in Christina's death remained in pretrial proceedings.

and Mayra shared, with their two children, one bedroom in a home on Congress Avenue in Providence. Mayra's parents also resided in this home with their own children, Mayra's siblings.

In the early morning of June 20, 2012, the Providence Fire Department was dispatched for an emergency call at respondent's home in connection with a report of a child not breathing. Lieutenant Dennis R. Tucker of the Providence Fire Department testified that, when he arrived at the home, he observed respondent and the child's mother in the driveway holding Christina in a blanket. When Lt. Tucker inquired of the mother what was the matter with the child, "she just said [Christina had] had difficulty breathing in the past." At that time, the child had no pulse and no signs of respiration. Lieutenant Tucker testified that, based on his experience, it was his opinion that the demeanor of the two parents "was not consistent with parents whose child may or may not have died or would die in the immediate future." Lieutenant Tucker immediately began performing emergency cardiopulmonary resuscitation (CPR) on the child, and the emergency vehicle transported her to Hasbro Children's Hospital in Providence.

After Lt. Tucker completed his testimony, DCYF called respondent to the witness stand. The respondent was asked numerous questions about the events of June 20. However, beginning with the first question, respondent answered, "I would like to practice my Fifth Amendment." The respondent would invoke his Fifth Amendment privilege to refuse to provide self-incriminating testimony in response to each and every question posed by DCYF's counsel, a total of sixty-seven times. At the outset, when it became clear that respondent would exercise his Fifth Amendment right, the trial justice asked respondent's counsel if he had advised his client of the consequences he might expect, to which counsel answered, "I explained to [respondent] in this case, the [c]ourt could draw adverse inferences from his exercising his Fifth Amendment right. So, yes, he does understand that, Your Honor."

Doctor Christine Barron then testified that the infant came under her care when she arrived at the hospital. Doctor Barron, who is the director of the hospital's child protection program, testified that the child was resuscitated and intubated upon admission to the hospital. However, from the time of her admission on June 20, 2012, until her tragic death, on July 7, she never regained consciousness. The injuries to Christina were so numerous that Dr. Barron testified, "I actually made a list of [Christina's] injuries * * * because there were so many injuries, to make sure I did not miss any of them." Chest X-rays revealed twenty different rib fractures, some older and some newer, at different stages of healing, which Dr. Barron testified could not have been caused by the CPR techniques employed by Lt. Tucker. The C.T. scans of the baby's head revealed a large degree of soft tissue swelling, four skull fractures, and a subdural hemorrhage, which is bleeding between the brain and the dura, the brain's protective membrane. Doctor Barron opined that these injuries, particularly the rib fractures, would have been "exceedingly painful." Further X-rays showed numerous fractures, including to the left and right wrist, left lower leg, right ankle, right femur bone above the knee, and to the left pubic bone. Lastly, Dr. Barron noted a scar under the infant's chin and severe retinal bleeding in both eyes.

In Dr. Barron's opinion, these injuries could not be adequately explained by the medical history provided by respondent or the child's mother to treating physicians. The medical records admitted at trial indicated that the mother suggested that maybe she and respondent "were burping the baby too hard," and that respondent had said that "accidentally sitting on the child's head or banging the child's head against a piece of furniture or dropping the child accidentally" may have been the cause of Christina's injuries. Doctor Barron dismissed these explanations, asserting that they were not at all consistent with the severity and the various stages of healing

- 4 -

that the injuries presented. The medical history also contained statements by the baby's paternal grandmother, who lived in New Bedford, Massachusetts, but often saw her son, respondent, and her grandchildren. Doctor Barron testified that the grandmother had said, "[Christina] always seemed to be moaning, seemed to be in pain whenever [the grandmother] picked up [Christina] * * * [the grandmother] was constantly telling [respondent] to take [Christina] to the doctor's," but respondent and Mayra "never sought medical care for [Christina]." Doctor Barron testified that "[t]he injuries to the infant would have and should have been obvious to all caregivers because of her injuries, her multiple rib fractures would have caused what we call paradoxical crying. * * * [U]sually when an infant is crying, you pick them up to console them, and they console, but when children or infants have multiple rib fractures * * * they cry more when you pick them up." Due to the seriousness of the injuries to Christina, and the fact that "Kristopher remained at risk if he remained in [respondent and his mother's] care," the doctors issued a "hold" on her brother Kristopher, and proceeded to examine him. Kristopher was examined at the hospital the same day Christina arrived, and he was found to have no injuries.

Next, Michaela Dolan, a child protective investigator for DCYF, testified about her interview with respondent at the hospital regarding the injuries to Christina. Ms. Dolan testified that respondent told her that "[h]im and his woman were the only two [caretakers of the children], that they don't work, and that nobody else cared for the children." When asked how Christina's injuries had occurred, Ms. Dolan testified, respondent said that during a 4 a.m. feeding, "he dropped her, and her head hit the dresser on the way down." Ms. Dolan said that this explanation "didn't make any sense" to her because it provided no insight as to who or what caused Christina's broken ribs. Ms. Dolan testified that she followed up on this line with respondent, who told her that "he lifts weights, sometimes doesn't know his own strength * * *

- 5 -

like if [he] picked the baby up to curl her, he might have cracked her ribs." Ms. Dolan further testified that there was a lack of consistency between the two parents' statements at their respective interviews.

At the time of trial, the criminal proceedings arising from Christina's death were continuing in the Superior Court and the trial justice explicitly made no findings regarding the criminal matter.[3] However, Kristopher had been placed with a nonrelative foster family, who had expressed a desire to adopt him. Tamara Guimond, a social worker with DCYF, testified that Kristopher had been in this same foster home since she first was assigned to the case.[4] In the care of this family, Ms. Guimond testified, Kristopher "has been developing and blossoming, flourishing, just really doing well in this home." It was Ms. Guimond's opinion that the best interests of Kristopher would be served if he were to be adopted by his foster family.

### Decision of the Family Court

After hearing testimony from the witnesses, the trial justice took the matter under consideration and issued a written decision on May 23, 2014. In that forty-five-page decision, the trial justice made thirty-four findings of fact, by clear and convincing evidence, to support her determination as to the parental unfitness of respondent. The trial justice drew from the testimony of the witnesses, noting their credibility, and the adverse inferences she made against respondent, who chose to exercise his Fifth Amendment right and refused to answer any questions at trial. Specifically, the trial justice found, "Dr. Barron's medical testimony, to be

---

[3] The trial justice's decision said, "[respondent] has been criminally indicted and is awaiting trial on charges relating to Christina's death. The [c]ourt makes no findings regarding the [respondent's] pending criminal matter." See note 2.

[4] At oral argument, Kristopher's guardian ad litem represented to the Court that he remains with this family.

- 6 -

most compelling and extremely persuasive." The trial justice also "dr[ew] reasonable inference[s] from [respondent's] testimony in light of all the other evidence."

The trial justice found that respondent was the sole and primary caretaker of Christina on the night of June 19 and morning of June 20, when the infant was admitted to the hospital. The trial justice also found that it was "uncontradicted and clearly substantiated that Christina's tragic death was a result of child abuse and was not caused by accidental means * * * ." These non-accidental injuries were also sustained at different times in the course of her short life. The failure to seek medical treatment for Christina "constitute[d] neglect and cruel and abusive conduct." Specifically, the trial justice stated, "[a] caring parent would have known the source of [her] injuries or would have reported the source if he had not caused them himself or permitted them to happen."

In making these findings, the trial justice relied on In re Chester J., 754 A.2d 772, 777-78 (R.I. 2000), and In re Frances, 505 A.2d 1380, 1384-85 (R.I. 1986), for the proposition that, even if respondent himself had not caused Christina's injuries, because he and the child's mother were the primary caretakers at the time of the injury, he was responsible for the unexplained injuries. Because respondent was found to be an unfit parent, due to the cruel and abusive nature of his conduct towards his daughter Christina, the trial justice concluded that the best interests of respondent's son Kristopher would be served by a termination of respondent's parental rights. A decree terminating respondent's parental rights to Kristopher was entered on May 30, 2014.

## II

## Standard of Review

"When reviewing cases involving the termination of parental rights, this Court examines the record to determine whether legally competent evidence exists to support the trial justice's findings." In re Chester J., 754 A.2d at 776 (citing In re Ryan S., 728 A.2d 454, 457 (R.I. 1999)). "Such findings are entitled to great weight, and this Court will not disturb them on appeal unless the findings are clearly wrong or the trial justice misconceived or overlooked material evidence." Id. (quoting In re Ryan S., 728 A.2d at 457).

## III

## Discussion

On appeal, respondent argues that it was error for the trial justice to terminate his parental rights because, even though he concedes that the trial justice had "compelling evidence before her that Christina suffered fatal injuries," she nonetheless lacked clear and convincing evidence of the culpability of respondent as the cause of those injuries. The process of terminating parental rights is not to be undertaken lightly, but it is our opinion that, in our deferential review of the record, we cannot say that the trial justice misconceived or overlooked material evidence in making her findings and ultimate decree. We shall address respondent's argument below and note the reasons for which we must affirm the decree of the Family Court.

We have said that "[n]atural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011) (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). Therefore, a parent has a right to due

process before the Family Court and may forfeit his or her parental rights only when the State can show by clear and convincing evidence that the parent is unfit. Id. Such a finding of parental unfitness is "the first [and] necessary step before any termination of parental rights can be initiated." In re Steven D., 23 A.3d 1138, 1161 (R.I. 2011) (quoting In re Antonio G., 657 A.2d 1052, 1057 (R.I. 1995)). The authority to request a termination of parental rights is given to DCYF by statute. See G.L. 1956 § 15-7-7. When a termination petition is filed on the basis of § 15-7-7(a)(2)(ii), "[c]onduct toward any child of a cruel or abusive nature[,]" the statute dictates that "the department has no obligation to engage in reasonable efforts to preserve and reunify a family." Section 15-7-7(b)(1). Finally, once a determination of unfitness has been made, "the best interests of the child outweigh all other considerations." In re Jazlyn P., 31 A.3d at 1279 (quoting In re Destiney L., 21 A.3d 279, 283 (R.I. 2011)).

The respondent, quoting In re Jazlyn P., 31 A.3d at 1282, acknowledges in his brief that "cruel or abusive conduct towards one child in a household can serve as a basis for terminating a parent's rights with respect to another child in the household." The legal argument respondent makes instead urges us to consider a recent case from this Court in which we vacated, for insufficient evidence, a termination of parental rights: In re Adner G., 925 A.2d 951, 960-62 (R.I. 2007). The child in In re Adner G. had injuries that were not readily apparent, "not visible to the naked eye," and "someone other than the parents had significant access to the child during the time when the injuries probably were inflicted * * * ." Id. at 960. Because of these facts, we said that it was not reasonable, and therefore legal error, to infer that it must have been the parents who inflicted or who allowed others to inflict the injuries. Id. But here, and in contrast to In re Adner G., the trial justice noted that Christina's injuries should have been apparent to respondent. Indeed, respondent was told by his own mother that he should take Christina to the

- 9 -

doctor because there was obviously something wrong with the infant, and Christina's paradoxical crying behavior should have raised a concern. Significantly, the trial justice also found that respondent was the sole and primary caretaker on the evening when Christina's fatal injuries were inflicted. Therefore, this case is readily distinguishable from In re Adner G..

On the other hand, it is our opinion that the case of In re Chester J. is almost entirely on point. In re Chester J., 754 A.2d at 773. In that case, there was also horrific child abuse, and the parents "were unable or unwilling to adequately explain the massive trauma suffered by th[e] infant." Id. at 777. We said that there was a reasonable inference that the parents caused or allowed the injuries to be caused to the child because the parents were the child's sole caregivers. Id. at 778 ("As the parents and primary caregivers of [the child], 'the law holds [them] to a greater level of substantial responsibility and awareness concerning the well-being of their children than it otherwise might in the case of an adult relative or a stranger.'"). Here, respondent was Christina's sole caregiver on the evening in question. The respondent was living and sleeping in the same room as Christina for the entirety of her life before her hospitalization, during the time when the medical testimony established that numerous serious injuries were inflicted upon the helpless child. There were no other caregivers and no daycare facilities in question. See In re Adner G., 925 A.2d at 954 (discussing the child's daycare arrangements).

The trial justice's findings that Christina's injuries should have been apparent to her caretakers and that the respondent was the sole caretaker on the night of June 20 were critical in the decision to terminate the respondent's parental rights. We can glean no oversight or misconception of the evidence by the trial justice in her decision that these facts were proven by clear and convincing evidence. The trial justice's finding that the respondent caused Christina's injuries was certainly reasonable, based on the clear and convincing evidence that he was the

- 10 -

sole caretaker at the time of the fatal injuries; therefore, a finding that he violated § 15-7-7(a)(2)(ii) was warranted, and the termination of the respondent's parental rights to his son, Kristopher, logically followed.

## IV

## Conclusion

For the reasons set forth above, we affirm the Family Court's termination of the respondent's parental rights to his minor son. The record may be returned to the Family Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      In re Kristopher J.

**CASE NO:**      No. 2014-206-Appeal.
(P12-798-1)

**COURT:**      Supreme Court

**DATE OPINION FILED:**  May 28, 2015

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Laureen D'Ambra

**ATTORNEYS ON APPEAL:**

For Petitioner:  Karen A. Clark
Department of Children Youth and Families

Shilpa Naik
Court Appointed Special Advocate

For Respondent:  Catherine Gibran
Office of the Public Defender