April 4, 2019

**Supreme Court**

No. 2017-321-Appeal.
(15-4108-1)

In re Sophia M.          :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Sophia M.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  Anna Brugeman (Anna or mother) appeals from a Family Court decree finding that she abused and neglected her infant child, Sophia.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we vacate the decree of the Family Court as it pertains to Anna Brugeman.

**I**

**Facts and Procedural History**

Sophia was born to Anna and Ernest M. (Ernest or father) on November 14, 2015.  According to the parents, on the evening of December 4, 2015, three-week-old Sophia was fed, bathed, and placed in her bassinet prior to 9 p.m. without any sign of injury.  Anna testified that, when Sophia woke up crying during the night, Anna "couldn't keep [her own] eyes open," so she asked Ernest to feed Sophia, telling him that she would wake up for the next feeding.  Anna said she went back to sleep until 7:30 the next morning.  In the meantime, Ernest tended to Sophia, changing her diaper before giving her a bottle.  Ernest testified that, while he was feeding Sophia,

her lip struck his collarbone. According to Ernest, Sophia cried for about five minutes after the incident, but she then took her bottle.

Anna testified that she first noticed an injury to Sophia's lip the next morning. When she asked Ernest how the lip bruising occurred, Ernest told her that when he was burping Sophia, her lip hit his collarbone. Ernest testified that, after this brief conversation with Anna, he changed Sophia's diaper and dressed her, but did not see any other injuries on her body. Later that day, Anna and Ernest brought Sophia and L.M.,[1] Ernest's other daughter, to a mall to take pictures with Santa, accompanied by L.M.'s mother. After arriving home from the mall, Sophia napped while Ernest took L.M. to the dog park at their apartment complex.

Anna changed Sophia's diaper when the infant woke from her nap that afternoon. Anna testified that she noticed a "weird shaped" bruise on Sophia's back, a lot of bruising above her upper shoulder blades, and a "little red bruise" on her stomach. Anna took pictures of the bruises and sent them to her mother around 2:30 p.m.; her mother advised her to call the pediatrician. Sophia's pediatrician suggested that Anna take Sophia to the hospital.

Shortly after, when Ernest and L.M. returned from the dog park, Anna told Ernest about her conversations with her mother and Sophia's pediatrician. Anna testified that Ernest was hesitant to go to the hospital at that point and that he suggested that they should wait until Monday to see if it cleared up. After a brief discussion, Ernest and Anna took Sophia to Hasbro Children's Hospital around 5:30 p.m., and the infant was admitted.

Ernest recalled at trial, however, that when he arrived home from the dog park earlier that afternoon, Anna notified him of a rash on Sophia's stomach, not bruising. He testified that he treated Sophia's stomach with lotion, and suggested to Anna that they take Sophia to a doctor if

---

[1] We shall refer to Ernest's other minor child by her initials.

the "rash" did not clear up in a day or so.[2] Ernest testified that he then took L.M. to CVS, and that it was only after he returned that Anna showed him the mark on Sophia's back. Ernest testified that he told Anna to call the pediatrician, and that he did not hesitate to take Sophia to the hospital.

Christine Barron, M.D., the on-call physician at Hasbro's child protection center, was consulted to examine Sophia at the hospital on the day after her admittance. Doctor Barron reviewed Sophia's emergency department records, obtained histories from Anna and Ernest separately, and then conducted a physical examination of Sophia. In his statement to Dr. Barron, Ernest said that the lip injury to Sophia occurred while he was burping Sophia, and that Sophia lifted her head and "cracked on his collarbone[.]" Ernest could not provide Dr. Barron with an explanation for the other bruises on Sophia's stomach, upper back, mid-back, right flank, and diaper area. Anna gave a similar history to Dr. Barron, differing only on the specific time that she noticed the bruise on Sophia's stomach and the question as to whether or not that bruise was actually a rash. Anna also informed Dr. Barron of a family history with "von Willebrand disease," a mild bleeding disorder.

Doctor Barron ordered a skeletal survey, a head CT scan,[3] and a "full workup," all of which came back normal; also, there was no indication that Sophia had a bleeding disorder. Doctor

---

[2] Anna also testified that she and Ernest had a conversation about a rash on Sophia's stomach. According to Anna, however, Ernest told her in passing that he noticed a rash on Sophia's stomach when he changed her diaper in the morning, prior to the visit to the mall with Santa. Anna testified that she told Ernest to put lotion on it, but that she did not inspect the rash on Sophia's stomach herself.

[3] "CT" is the abbreviation for "computerized tomography," also known as "computerized axial tomography," which is a "technique * * * used in diagnostic studies of internal bodily structures, as in the detection of tumors or brain aneurysms." American Heritage Dictionary 380 (5th ed. 2011).

Barron's physical examination revealed that Sophia had petechia[4] on her chest and "bruises of different colors" on her abdomen, diaper area, upper back, mid-back, and right flank into her right buttocks. Although she could not age the bruises, Dr. Barron listed the stomach bruise as "acute[,]" meaning "identifying usually within 12 to 24 hours." Additionally, Dr. Barron testified that the bruise on Sophia's right flank had not been documented in the emergency department, but emerged a few hours after Sophia arrived at the hospital. She testified that this injury did not occur while Sophia was in the hospital, explaining that it would not be uncommon for a bruise to "take a few hours or * * * even a day to demonstrate itself." Doctor Barron noted that, from the day of her admittance until her discharge on December 11, 2015, Sophia's injuries healed normally and she did not sustain any additional bruising while in the hospital.

In accordance with her standard protocol, Dr. Barron also reviewed the medical history of L.M., then three years old. L.M.'s medical records indicated that she had been brought to the hospital with unexplained bruising on her stomach and diaper area a few weeks after she was born, and that L.M.'s mother was instructed "not to allow the father to be [L.M.'s] sole caregiver[.]" Although the Department of Children, Youth, and Families (DCYF) had not been contacted during L.M.'s visit to the hospital, Dr. Barron testified that "on full review of the older sibling[,] * * * those injuries would be consistent with child physical abuse." Doctor Barron stated that she found the similarities between the bruising history of L.M. and Sophia to be significant, but she emphasized that she did not base her decision in Sophia's case on the information in L.M.'s records.

---

[4] "Petechia" is defined as "[a] small purplish spot on a body surface, such as the skin or a mucous membrane, caused by a minute hemorrhage * * *." American Heritage Dictionary 1320 (5th ed. 2011).

After her initial interviews with Anna and Ernest, Dr. Barron explained to both parents that "the history that was provided for [Sophia's] lip injury was not consistent with the amount of force that is necessary to cause that injury." Three days later, when Dr. Barron met with the parents again, Ernest provided Dr. Barron with a different history for Sophia's lip injury. Ernest told Dr. Barron at that time that he remembered that Sophia hurt her lip not when he was burping her, but instead when he was leaning over to grab a bottle out of the warmer. Doctor Barron testified that she found this second explanation to be "more probable" because it implied more force; but, she also commented that she found it "concerning" that the story changed after she had informed the parents that the history they had originally provided was not consistent with the injury.[5]

Ultimately, Dr. Barron concluded that Sophia's injuries were caused by "blunt force trauma that would be consistent with child physical abuse"; she reported those findings to DCYF and the Warwick Police Department. Following her release from the hospital, Sophia was placed in the care of her paternal aunt. DCYF filed an abuse-and-neglect petition on December 8, 2015, pursuant to G.L. 1956 chapter 11 of title 40, alleging that: (1) Anna and Ernest failed to provide Sophia a minimum degree of care; (2) Sophia was "without proper parental care and supervision"; and (3) Ernest and Anna inflicted, or allowed to be inflicted, physical injury upon Sophia.[6] Trial

---

[5] Ernest offered a third explanation for Sophia's lip injury in September 2016 to the investigating officer, Detective John McHale. Ernest told Det. McHale that he held Sophia with one hand under her buttocks and her head resting on his shoulder as he reached down to pick up a bottle off a table that was roughly two feet tall. Ernest stated that he felt Sophia falling as he reached down and when he stood back up, she struck her lip on his shoulder. Detective McHale surmised that the difference between the second and third explanations was that, in the third explanation, Ernest would have bent down even further, generating more force when standing back up.

[6] General Laws 1956 § 40-11-2(1) reads, in relevant part:

> "(1) 'Abused and/or neglected child' means a child whose physical or mental health or welfare is harmed, or threatened with harm, when his or her parent or other person responsible for his or her welfare:

commenced before a Family Court justice on January 26, 2017, and ended on May 8, 2017, after eleven separate days of testimony.

After considering all of the testimony and exhibits, the trial justice found clear and convincing evidence of child physical abuse. The trial justice determined that Ernest had caused Sophia's lip injury while the child was in his exclusive control. Additionally, the trial justice found that "[a]lthough Sophia's injuries may not have occurred over a prolonged period of time," based on Dr. Barron's testimony regarding the bruises, "Sophia's injuries were not the result of a one-time episode of abuse, but sustained over a period of time." She went on to state, "it is clear to this [c]ourt that the bruises were all in various stages of forming or healing." The trial justice found that Sophia's injuries were the result of child physical abuse and that both Anna and Ernest had: (1) failed to provide Sophia with "a minimum degree of care, supervision, or guardianship"; (2) "inflicted or allowed to be inflicted upon the child physical injury"; and (3) "created or allowed to be created a substantial risk of physical injury to the child." In her decision dated July 10, 2017, she determined that Sophia was abused and neglected as to both Ernest and Anna; she ordered that

---

"(i) Inflicts, or allows to be inflicted, upon the child physical or mental injury, including excessive corporal punishment; or
"(ii) Creates, or allows to be created, a substantial risk of physical or mental injury to the child, including excessive corporal punishment; or
"* * *
"* * *
"(v) Fails to provide the child with a minimum degree of care or proper supervision or guardianship because of his or her unwillingness or inability to do so by situations or conditions such as, but not limited to: social problems, mental incompetency, or the use of a drug, drugs, or alcohol to the extent that the parent or other person responsible for the child's welfare loses his or her ability or is unwilling to properly care for the child[.]"

Sophia be committed to the care, custody, and control of DCYF until further order of the court. Anna filed a notice of appeal on July 18, 2017.[7]

## II

## Standard of Review

Rule 17(b) of the Family Court Rules of Juvenile Proceedings provides that a "determination that a child is abused, neglected, or dependent shall be made upon clear and convincing evidence." *In re Madlyn B.*, 187 A.3d 1105, 1118 (R.I. 2018) (alteration omitted) (quoting *In re Adner G.*, 925 A.2d 951, 957 (R.I. 2007)). It is well settled that the clear and convincing standard is "a higher standard of proof than that of a fair preponderance of the evidence but less than that required for proof beyond a reasonable doubt." *In re Emilee K.*, 153 A.3d 487, 497 (R.I. 2017). Moreover, we have stated that the clear and convincing standard is "significant[,]" *id.*, and "requires that the fact-finder form a clear conviction without hesitancy of the truth of the precise facts in issue." *In re Madlyn B.*, 187 A.3d at 1118 (quoting *In re Adner G.*, 925 A.2d at 957). Nonetheless, it remains true that a trial justice's "findings are entitled to great weight and will not be reversed on appeal unless the trial justice overlooked or misconceived material evidence, or was otherwise clearly wrong." *Id.* at 1118-19 (quoting *In re Adner G.*, 925 A.2d at 957). Accordingly, on appeal, this Court will "examine the record to determine whether legally competent evidence exists in it to support findings made by the trial justice." *In re Adner G.*, 925 A.2d at 957 (quoting *In re Mackenzie C.*, 877 A.2d 674, 685 (R.I. 2005)).

---

[7] Anna filed her notice of appeal prematurely, before a final decree entered on August 3, 2017. "This Court, however, will treat the premature notice[] of appeal as if [it] had been timely filed after the judgment was entered." *In re Briann A.T.*, 146 A.3d 866, 872 n.5 (R.I. 2016). Ernest did not appeal the decree.

## Discussion

On appeal, Anna argues that the trial justice overlooked or misconceived relevant law and evidence, ignored evidence contradicting her findings, and disregarded uncontroverted evidence. Specifically, Anna argues that the trial justice disregarded Dr. Barron's expert testimony in finding that Sophia's injuries were "sustained over a period of time," that there "were at least three * * * separate events" that caused Sophia's injuries, and that the bruises were all in various stages of healing. Anna also argues that the trial justice based her finding of abuse and neglect on "an impermissible pyramid of inferences[,]" and she further argues that the only reasonable inference to be drawn from the evidence is that Ernest's actions were the sole cause of Sophia's injuries. Conversely, DCYF avers that the trial justice did not misapply the law, and further argues that the trial justice did not err in finding clear and convincing evidence of abuse and neglect "[i]n light of the medical testimony and the parents [*sic*] lack of any explanation for [Sophia's] multiple bruising[.]"[8]

After careful examination of the record, we are of the opinion that, under the clear and convincing standard, the evidence in this case is not sufficient to support a finding of abuse or neglect as to Anna. We begin our review of the evidence with several uncontested facts. First, Anna and Ernest were the exclusive caretakers of Sophia, and, second, Sophia was placed in her bassinet around 9 p.m. on December 4, 2015, without any visible sign of injury. It is also uncontested that Ernest's actions were the sole cause of the injury to Sophia's lip. A fourth virtually unassailable factual finding by the trial justice is that Sophia's injuries were the result of

---

[8] The Court Appointed Special Advocate also submitted a counterstatement to the Court, similarly arguing that the trial justice did not misconceive or overlook relevant law or evidence.

blunt-force trauma consistent with child physical abuse. Doctor Barron based her expert opinion upon the knowledge that a three-week-old infant is immobile and unable to injure herself.

Significantly, however, we are unable to find sufficient evidence in the record to support the trial justice's critical finding of fact that "Sophia's injuries were not the result of a one-time episode of abuse, but sustained over a period of time." Doctor Barron described Sophia's stomach bruise as "acute[,]" meaning "identifying usually within 12 to 24 hours[,]" and the right flank bruise as "evolving," a type of bruise that can also take time to present itself. Doctor Barron did not suggest, however, that the bruises were the result of more than one occurrence of abuse. Rather, she testified that "sometimes it can take a few hours or * * * even a day [for a bruise] to demonstrate itself[,]" and that, although some of the bruises were of different colors, she could not age them. Therefore, we agree with Anna that the trial justice misconstrued this part of Dr. Barron's testimony.

Moreover, in her decision, the trial justice characterized as "jarring" the similarities between the injuries sustained by L.M., Ernest's oldest daughter, and those suffered by Sophia "when both girls were of the same age and under the care of the same [f]ather[.]" Although the injuries to L.M. were not reported to DCYF at the time, they were, according to Dr. Barron, consistent with child physical abuse. The evidence of injuries to L.M. may well have been relevant to the neglect and abuse charges pending against Ernest relating to Sophia, which were tried in the same proceeding as those against Anna. Such evidence, however, had little relevance, if any, with respect to Anna. Even if Anna were aware of the incident with L.M., there was no suggestion, prior to Dr. Barron's assessment, that the injuries to L.M. may have been caused by physical abuse.

Anna also asserts that the trial justice erroneously relied on *In re Chester J.*, 754 A.2d 772 (R.I. 2000), and *In re Frances*, 505 A.2d 1380 (R.I. 1986), contending that these two cases "could

not be more distinguishable" based upon the extent of the injuries and the time frame of the abuse. In her decision, the trial justice cited to *In re Chester J.* and *In re Frances* to support her finding of abuse and neglect, stating:

> "The Rhode Island Supreme Court has held that there is no duty upon the state to discern which parent actually inflicted the abuse against the child. *See In re Chester J.*, 754 A.2d 772, 778 (R.I. 2000). Allowing a parent to ignore or stand by while such abuse and neglect occurs is tantamount to the parent inflicting the abuse themselves. *See [i]d.* While this is an Abuse and Neglect trial, the Rhode Island Supreme Court has also held that termination of parental rights was justified where a parent claimed ignorance to the source of a child's serious injuries. *See In re Frances*, 505 A.2d 1380, 1385 (R.I. 1986). Inferences to be drawn from the evidence in the record should not be ignored. *See [i]d.* at 1384."

In *In re Frances*, this Court affirmed a finding of abuse in a parental-rights termination case in which an eleven-month-old child was found to be in a permanent vegetative state with serious head injuries, extreme dehydration, and bruises—some days or weeks old—scattered about her body. *In re Frances*, 505 A.2d at 1382. This Court noted that the treating physician described the child's injuries to be "in various stages of healing" and that the mother could not give an adequate explanation for any of her child's severe injuries, ultimately finding that "[i]t was reasonable for the trial justice to conclude on the basis of the evidence before him that a loving, caring parent would have known the source of the injuries and would have reported this information to physicians or to the police if she had not caused them herself or permitted them to happen." *Id.* at 1384-85.

In the case of *In re Chester J.*, we similarly affirmed a Family Court decree terminating parental rights to a child who suffered severe injuries when he was seven months old, including at least nine rib fractures, two leg fractures, bruises, lesions, and bite marks. *In re Chester J.*, 754 A.2d at 773-74, 777, 778. The child's treating physician testified that these injuries were in various

stages of healing, leading this Court to agree with the trial justice that the injuries were "incurred over a sustained period." *Id.* at 773-74, 777. Additionally, the trial justice in that case had found that the child's primary caregivers, his mother and father, "expressed 'complete and total ignorance of how the child's horrific injuries were inflicted[,]'" and that the child's mother provided inconsistent explanations for the child's severe injuries. *Id.* at 776, 777. This Court held that "the state [wa]s not required to prove which parent actually inflicted the abuse[,]" because "[a]llowing parents to ignore or to stand by while such abuse and neglect occurs is tantamount to the parents inflicting the abuse themselves for purposes of a termination * * *." *Id.* at 778.

It is perhaps axiomatic to observe that no two cases are precisely alike. Here, however, there are obvious stark differences between the circumstances concerning the injuries sustained by Sophia and those inflicted upon the children in *In re Chester J.* and *In re Frances*. Not only were the injuries in *In re Chester J.* and *In re Frances* far more severe than the bruises presented by Sophia, they were sustained over a much longer period of time. *See In re Chester J.*, 754 A.2d at 773-74, 777; *In re Frances*, 505 A.2d at 1382. Thus, we are satisfied that the cases upon which the trial justice relied to support her finding of abuse and neglect are readily distinguishable.[9]

Moreover, the evidence suggests that Anna did not "ignore" or "stand by while such abuse and neglect occur[ed.]" *In re Chester J.*, 754 A.2d at 778. Rather, according to the testimony at trial, upon noticing the bruises while changing Sophia's diaper on the afternoon of December 5,

---

[9] Anna also contends that the case at bar is analogous to *In re Adrina T.*, 162 A.3d 658 (R.I. 2017), in which we vacated a trial justice's finding of abuse and neglect against a mother whose child sustained a leg fracture when she left the child in the sole care of the father for a few hours. *In re Adrina T.*, 162 A.3d at 660, 670-71. *In re Adrina T.* is analogous to the case before us in that we are unable to find evidence "in the record that reflects a pattern of injuries 'incurred over a sustained period.'" *Id.* at 670 (quoting *In re Chester J.*, 754 A.2d at 777). However, there are two distinguishing, critical factors in *In re Adrina T.* not present in the case at bar: (1) undisputed evidence demonstrating that the mother was not present when the child was injured; and (2) expert medical testimony suggesting that the child's injuries could have been accidental. *Id.*

- 11 -

2015, Anna photographed the bruises, contacted her mother, and then called the pediatrician. Following these conversations and, according to Anna, after encountering some resistance from Ernest, she took Sophia to the emergency room approximately three hours after discovering the injuries. Additionally, at trial, Dr. Barron confirmed that Anna reported the injuries "immediately[,]" and she testified that it was "appropriate" for Anna to "seek additional help and then follow the advice of the physician." We are of the opinion, therefore, that Anna's response to discovering the bruising, even if arguably dilatory, does not support a finding of abuse or neglect.

Actions that take place in the privacy of one's home or behind closed doors are often not amenable to definitive determinations. In the case at bar, the trial justice was understandably troubled that Anna never awoke when her baby "was screaming[,]" neither parent could provide an adequate explanation for Sophia's injuries, and neither "ever asked, suspected or accused the other of causing any of [her] injuries[.]" Based upon our review of the record, however, we are convinced that such facts, together with the trial justice's other factual findings, do not create a reasonable inference, by clear and convincing evidence, that Anna neglected or abused Sophia, or allowed abuse to be inflicted upon her. DCYF has failed to produce sufficient evidence to meet that exacting standard of proof. Thus, after careful review, we are unable to conclude that the trial justice's findings are supported by legally competent evidence.[10]

---

[10] We take this opportunity to note that it has been over three years since the child was placed in the custody of her paternal aunt while trial and appeal were pending. We find it concerning that there has been little movement toward reunification during that time in this case. The pendency of an appeal from a finding of abuse and neglect should not be the reason for delaying efforts to reunify the child with one or both parents, should that be in the best interest of the child.

## IV

## Conclusion

For the reasons set forth herein, we vacate the decree of the Family Court as it pertains to Anna Brugeman.  The record shall be returned to that tribunal.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Sophia M. |
| **Case Number** | No. 2017-321-Appeal.<br>(15-4108-1) |
| **Date Opinion Filed** | April 4, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Kent County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Karen Lynch Bernard |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Karen A. Clark<br>Department of Children Youth and Families<br><br>Karl D. Beauregard<br>Court Appointed Special Advocate<br><br>For Respondent:<br><br>Robert E. Craven, Esq.<br>Nicholas A. Solitro, Esq. |