## In re FRANCES.

### No. 85–27–Appeal.

Supreme Court of Rhode Island.

March 18, 1986.

Laureen Q. D'Ambra, for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst and Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on appeal from a decree of the Family Court terminating parental rights. The Department of Children and Their Families (DCF) had petitioned for the termination of this mother's parental rights in regard to all five of her children under G.L.1956 (1981 Reenactment) § 15–7–7(b)(2), as amended by P.L.1983, ch. 232, § 1, alleging that the mother is unfit by reason of conduct seriously detrimental to the children, the conduct being of a cruel and abusive nature to her fourth child, an eleven-month-old girl. We affirm.

The mother had four daughters,[1] the oldest born September 4, 1977, the next born

---

1. The mother had two daughters, two years old and six months old, by the time she was incarcerated at the training school in 1979. She had

been adjudicated delinquent after committing an act that would have constituted murder had she been an adult. She was seventeen years of

January 29, 1979, the third, born March 12, 1980, and the victim of the mother's abuse, born March 5, 1982. The fifth child, a son, born after the events that gave rise to the petitions concerning the four older children, was also made the subject of a petition to terminate filed January 18, 1984.[2]

On the morning of February 10, 1983, Billie Rae,[3] age eleven months, was admitted to Rhode Island Hospital through the emergency room. She was "unresponsive, having seizures, extremely dehydrated, with bruises over her head, around her head and upper part of her face and arms." She was "extremely critically ill" in the opinion of the physician who examined her. The infant was unable to breathe on her own; she had a high fever and was comatose. She remains in a permanent vegetative state assisted with breathing and feeding by means of tubes inserted in the lungs and stomach.

About two months earlier, in December 1982, the infant had been admitted to St. Joseph's Hospital because she "was taking seizures, started jerking her arm and stiffening out, and her eyes were like rolling, and she just passed out." It looked as if she had stopped breathing, according to the mother. She said the baby "never got better," although the mother did not follow up on any treatment after that earlier admission.

On February 10, 1983, Billie Rae was brought to Rhode Island Hospital for treatment of severe head injuries. About the events surrounding this admission the mother testified:

"[T]hat morning, I left. I came back. My brother and Denise was leaving. I walks through the kitchen, and the living room, and the bedroom. The covers was jumping. I pulled the covers back and that's when I seen her laying there * *. I picked her up. She just collapsed like she was everything was broken, and my brother and them was heading outside, and I yelled for them to come back, and I asked one of them to stay with the kids while I run and take her to the hospital * * *."

The pediatric neurologist who examined the infant at Rhode Island Hospital testified that when he first saw the child

"she was intubated for air with a support. * * * she showed signs of progressive brain swelling, which necessitated further therapy with medication to stop the swelling * * *. There were multiple bruises about her body, particularly the head and left lip. There was soft tissue swelling of the scalp * * * There was evidence of dehydration, and the skin turgor was very poor. In addition, there was evidence of poor hygiene, in that the child's body was dirty. There were caked feces on the genital areas, and I should also mention that the bruises were multiple, and also in various stages of healing, such that some appeared relatively fresh and others looked as if they had been present for days or perhaps even weeks."

Another physician said that there were signs of extreme dehydration suggesting "at least days and days of inadequate intake."

The extreme brain swelling signified the severest form of brain injury and "infarc-

age at the time of the murder. The two girls were cared for by her family while she was serving her sentence. While at the training school she gave birth to a third daughter on March 12, 1980. Beginning in August 1980 she was allowed home visits, and on March 5, 1982, she gave birth to a fourth daughter, the victim in this case.

**2.** The proceedings in this case were against the mother only. The parental rights of the father

of the two oldest girls had already been terminated. The state did not proceed against the putative father of the girl born March 12, 1980, nor against the putative father of the victim of abuse and the infant boy.

**3.** The name used is an alias to protect the anonymity of the child.

tion or death of large areas of the brain had, in fact, occurred." The neurologist testified that in his expert opinion the cause of Billie Rae's injuries was "unlikely to be a mere accident." He also stated it was extremely unlikely that her injuries could have been caused by "routine disciplinary measures" or by "one of the [other] children" or by a fall from her walker. At the time of trial the child was in "a persistent vegetative state" from which recovery remains unlikely.

One of the admitting physicians filed a battered-child report "[b]ecause it was felt that there was no adequate explanation for this child's critical presentation and neurological damage." He explained this by stating that

> "the mother had been the primary caretaker of this child, and accordingly, that would have been the person to get any history from, and we had no history that was consistent with the severity of the illness and the degree of brain damage."

Another physician also filed reports on the three older girls after an examination of them revealed bruises, superficial lacerations, and indications of exposure to heat and cold on the girls' hands. These factors, coupled with Billie Rae's critical condition, convinced him that the other children were at risk.

The mother testified that a day or two before the hospital admission Billie Rae had "one little bruise" caused by falling out of her walker. She also said that the child had been vomiting and suffering from diarrhea and that on the evening of February 9 she looked really sick. The mother denied that she had ever abused any of her children.[4]

The psychiatrist who testified for the state had examined the oldest child and reviewed reports and the medical history of the entire family. She was of the opinion that the child had been exposed to much disruption, chaos, and possible violence in the home. She recommended that this child and the others not be returned to live with their mother. She said that if the mother had in fact previously been convicted of murder and if she was in fact responsible for Billie Rae's vegetative state, then in her expert opinion the mother was unfit to parent these children or any other child. It was also her opinion that rehabilitation of the mother was unlikely.

The three older girls were also examined by a clinical social case-worker and a staff team from Bradley Hospital. Their recommendation was that the two older girls were in need of long-term therapy and a stable, nurturing home environment. The third child was found to be psychologically attached to and bonded with her paternal grandparents and therefore not in need of any therapy. The youngest child, the boy, had never lived with the mother and was being adequately cared for by his father's parents, who planned to adopt him.

On her release from the training school at age twenty-one, the mother had taken charge of and possession of her three younger daughters. The oldest had remained with the paternal grandparents nearby. Living in the home with the mother and three daughters was the mother's brother and his girl friend. As we noted earlier, the youngest child, the son, had not yet been born. Although the physician who admitted the child said the mother denied ever leaving the baby alone with

---

4. By way of impeachment, on cross-examination, she admitted that she had pleaded nolo contendere to a charge of first-degree child abuse based on the injuries suffered by Billie Rae and that she had been sentenced to seven years, with two years suspended, which sentence she was serving at the time of the hearing on termination. She explained that she had pleaded to the charge on the advice of counsel because of "the simple fact that my daughter was in my custody and her state that she's in now, I could have got ten years just for that."

She also admitted that she had been in the training school from age seventeen to twenty-one for having been convicted of delinquency murder at age seventeen.

other adults, the mother said she often left the children in the care of relatives, as well as with the brother and girl friend who lived with her and the children.

After hearing, the trial justice rendered a decision in which he found that

"the injuries suffered by [the child] were not inflicted by any person to whom the child's care was entrusted by the respondent, or from her siblings or self-inflicted, or from accidental means, and * * * the child suffered multiple and severe injuries over a period of time, while her care was being neglected by the mother and that the mother was the principal caretaker of the child during the time when the injuries were inflicted * * *."

The trial justice further held that these findings gave rise to a reasonable inference that the injuries suffered by the child were inflicted by the mother. He found that she was not capable of providing a stable, nurturing home environment for her children, that she posed a serious risk of harm to them, and that the fact that she was in prison would cause her children to grow apart from her and would prevent any program for reunification with them.

On appeal the mother argues that the right to bear and raise children is fundamental. This court has specifically upheld the right of a family to undisturbed privacy in determining its internal arrangements. *In re Lester*, 417 A.2d 877 (R.I.1980). However, this right is not unlimited. *Id.* In *Lester* we determined that the welfare of the children whose basic rights are violated or threatened can warrant a regulation or termination of parental rights. We adopted a three-dimensional test that gives due regard to the interests of the parents, the children, and the state.

■ The DCF sought termination of the mother's parental rights under § 15–7–7(b)(2),[5] which provides:

"The court shall, upon a petition duly filed after notice to the parent and hear-

ing thereon, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child if the court finds as a fact that:

* * * * * *

(b) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as

* * * * * *

(2) Conduct toward any child of a cruel or abusive nature."

In cases involving termination of parental rights, this court will examine the record to determine whether there is legally competent evidence to support the findings of the trial justice. *In re Crystal*, 476 A.2d 1030, 1033 (R.I.1984).

■ The mother argues that the only evidence to support the charge that she had physically abused Billie Rae was the fact that the baby had sustained serious injuries of unknown but probably not accidental origin, that the mother was the primary care giver, and that there was no affirmative evidence that a secondary care giver had inflicted the injuries. She argues that there was no affirmative evidence to show that her brother and his girl friend were not responsible for the child's injuries. Consequently, given the paucity of the evidence, the trial justice erred in finding that there was clear and convincing evidence that the mother had injured the child.

The mother ignores the obvious inferences to be drawn from the evidence in the record. That evidence established that she was the primary care giver who at one point denied leaving the children with anyone and at another time said she often left the child with relatives. There were injuries in various stages of healing, indicating that they had occurred over time, and these injuries were not adequately explained. The mother gave no adequate explanation

---

5. This statute has since been amended but the pertinent portions remain unchanged.

for the massive injuries to the brain that were caused by great force. The mother gave inconsistent histories to the police and physicians, none of which explained the child's pitiful condition. It was reasonable for the trial justice to conclude on the basis of the evidence before him that a loving, caring parent would have known the source of the injuries and would have reported this information to physicians or to the police if she had not caused them herself or permitted them to happen. *See State v. Durand,* 465 A.2d 762 (R.I.1983). Balancing the interests of this mother against those of the children and the state, we conclude that the action of the Family Court was fully justified. "The state, under the scrutiny of the court, need not wait until a child's life has been permanently and irretrievably impaired before acting." *Lester,* 417 A.2d at 881 (quoting *In re Yetter,* 22 Wash.App. 304, 308, 589 P.2d 815, 817 (1979)). Billie Rae's tragic experience need not be repeated by her sisters or brother. We agree with the trial justice that there was clear and convincing evidence to support the petition for termination of the mother's parental rights.

■ Finally, the mother's counsel argues that it was error for the trial justice to order termination of her parental rights because the state had never attempted to reunify the mother with her children. Reunification would have been a little difficult, to say the least, in a situation like this. A brief review of the record and of this woman's incredible life demonstrates why this argument is totally lacking in merit. It is difficult to see how during her current five-year prison sentence any reunification could take place. Furthermore, in the opinion of the experts who testified, the children should never be returned to the mother. It seems obvious that even a modicum of concern for their safety would militate against returning the children to this woman.

■ Although parental rights should not be terminated for the sole reason of convic-

tion of a crime and incarceration, the fact of incarceration may be considered along with other factors in determining whether parental rights should be terminated. *In re Interest of Ditter,* 212 Neb. 279, 284, 322 N.W.2d 642, 645 (1982); *In re Interest of Wagner,* 209 Neb. 33, 36–37, 305 N.W.2d 900, 902 (1981).

■ The mother relies principally upon § 471(a)(15) of the Federal Adoption Assistance and Child Welfare Act of 1980 codified at 42 U.S.C.A. § 670 through § 676 (West 1983) which requires reasonable efforts at reunification. The particular sections of the federal act relied on by the mother did not become effective until October 1, 1983. Therefore, they do not apply to the petitions concerning the four older children because they were found to be abused and neglected on April 8, 1983, and the petitions for termination of their mother's parental rights as to them were filed on June 24, 1983.

The petition concerning the son was filed on January 18, 1984; it would appear, therefore, that the federal act applies in his case. Under the act, federal funds are available to the states for use in child-welfare cases. The states must comply with the requirements of the federal statute or be deprived of federal funds in those cases where compliance was lacking. The act requires that in each case, reasonable efforts to reunify be made: (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home. Under 42 U.S.C.A. § 671(a)(16), the state must provide for the development of a case plan for each child receiving foster-care maintenance payments.

It is obvious, however, that the act was never intended to require that all children be returned home, nor does the reunification provision imply that all children can be returned to their original home. We say

this because the act itself and the regulations through which it is implemented use the phrase "reasonable efforts" in establishing the reunification standard. The proposed rules relating to reunification, the substance of which was incorporated in the act and its regulations, makes it clear that reunification is not mandatory by stating, "when reunification is to take place *or* an alternative plan undertaken." (Emphasis added.) *Proposed Rules for PL96–272*, 45 Fed.Reg. 30932, 30935 (1982) (codified at 45 C.F.R. § 1356.21(b)(c) (1985)). It seems clear that Congress did not intend to require that all children be returned home but in fact recognized that in some cases alternative planning would be appropriate.

It is argued that an inconsistency exists between the Federal Adoption Assistance and Child Welfare Act of 1980 and § 15–7–7(b)(2), which does not require reasonable efforts to be made by DCF for reunification before filing a termination petition when a parent is unfit because of cruel or abusive conduct toward any child or because of conditions surrounding the child that are cruel or abusive. We find no inconsistency because the case plan required by federal guidelines before a termination petition is filed can be a plan for permanent placement of the child when reunification is either inappropriate or impossible. The mother's position on this issue has no merit.

For these reasons, the mother's appeal is denied and dismissed, the action of the Family Court is affirmed, and the papers of the case are remanded to the Family Court with directions that final decrees concerning each of the five children be entered forthwith, *nunc pro tunc.*[6]

---

6. Although the decision of the Family Court indicates that decrees were to be presented in each case, no decrees were transmitted with the record of the case. Rather than remand the case for entry of decrees, in the interest of time we have treated the appeal as though proper decrees had been entered.