496 N.W.2d 589 (1993)
In the Matter of A.S., K.S., and P.S., Alleged Dependent Children.
No. 17853.
Supreme Court of South Dakota.
Considered on Briefs November 19, 1992.
Decided February 24, 1993.
Cynthia Howard of Minnehaha County Public Defender's Office, Sioux Falls, for appellant father.
Mark W. Barnett, Atty. Gen., Joan P. Baker, Asst. Atty. Gen., Pierre, for appellee State.
Laurel Eggers, Sioux Falls, for appellee mother.
WUEST, Justice.
Y.V.N. (hereinafter "Father") appeals an order terminating his parental rights. While Father was serving a five year sentence in the state penitentiary, his wife left two of their three children with South Dakota Social Services. The circuit court found the children dependent and neglected and terminated Mother's and Father's parental rights. Shortly thereafter, Father was released from the penitentiary and requested reconsideration of the termination of parental rights. The circuit court considered Father's request and reaffirmed its termination order.
We agree with Father that several of the trial court's findings of fact are clearly erroneous because they are unsupported by evidence in the record. For example, the trial court found that "reasonable efforts" had been made to return the children to Father. In fact, there is no evidence that Social Services made any efforts to work with Father. It is fundamental that before parental rights can be terminated, "reasonable efforts" must be made to aid parents in maintaining their children. In re A.D., 416 N.W.2d 264, 267 (S.D.1987).
We reverse the circuit court's order terminating Father's parental rights and remand for a new trial.
MILLER, C.J., and AMUNDSON, J., concur.
*590 HENDERSON, J., concurs with writing.
SABERS, J., dissents.
HENDERSON, Justice (concurring).
Unquestionably, decisions of the lower courts in the Unified Judicial System of this state (one can likewise say this applies in the tribunals across the land) are entitled, from both the Bench and the Bar, to careful attention and respect. Appellate courts exist for a reason. Their function is, basically, to "(1) see that justice is done according to law in the cases that are brought before it, (2) to see that justice is administered uniformly throughout the state, and (3) to give authoritative expression to the developing body of the law." Parker, Improving Appellate Methods, 25 N.Y.U.L.Rev. 1 (1950). On the other hand, the decisions in the trial courts cannot beget positive rules or conclusive authority. Trial courts are the hotbed of legal conflict and fevered litigation should cool in the academic environs of appellate courts. Trial courts are decision makers and it is the appellate courts' job to determine if the decisions are right or erroneous. Trial courts are confronted with a staggering increase of cases which damage the deliberation of justice. I concur in the holding of the majority opinion but chiefly address my thoughts to (3) above.
To specifically address (3) above, I must necessarily recite the factual background in a limited manner.
Behavior of human beings takes on many facets, some significant, some not. Father, whose parental rights are in question, is a South Vietnam refugee having arrived in the United States in 1981. Throughout his residence in the United States, he has made his home in the Midwest, having lived in Pipestone, Minnesota, Sioux Falls, South Dakota, and Sioux City, Iowa. Father has a history of steady employment. Although never married, mother and father assumed a traditional mother/father role. Three children were begotten of their cohabitation. Father supported mother and the three children while mother was the homemaker remaining with the children. Facts developed at trial court level that father would play with the children and, occasionally, prepare their meals. There is absolutely no evidence of any physical abuse by father to these children. Mother began living with father at the age of eighteen. In 1990, because of "a lot of fight and a lot of arguments," mother moved from the family abode to her parents' home in Sioux Falls, South Dakota, taking the three children with her, ages three, one, and two months old. Mother obtained a Protection Order. Father was forbidden from contacting mother and visiting the children; temporary custody was vested, by court order, with mother.
A startling development happened to this couple which further disrupted the family unit. Father, who had no previous brush with the law, was indicted and found guilty of Possession of a Controlled Drug and Distribution of a Controlled Drug. Stemming therefrom, he was first sentenced to 10 years in the State Penitentiary; the sentence was later modified to 5 years. On May 29, 1992, he was granted parole. The record suggests he is free and back to his mid-west employment habit. While in prison, his parental rights were terminated; once out of prison, father petitioned that the termination of his rights be vacated. Petition was denied. The settled record discloses, as confirmed by both the State's and father's briefs, that father had no adverse disciplinary reports when he was in the State Penitentiary.
Mother surrendered custody of the three children to the Department of Social Services; she also abandoned the children, moved out of the state, and failed to appear at the Dispositional Hearing. These facts and procedural history spawned this appeal. It is noteworthy that mother filed a brief in these proceedings containing 33 words to the effect (a) she waives oral argument (b) she urges this Court to affirm the trial court and (c) she adopts the State's brief. Not one shred of authority or rationale supports the 33 words. Mother's legal position seems to be: I don't want the children and I don't want you (father) to have them either. As I expressed earlier, human behavior takes on many facets.
*591 Here, we have a mother who has abandoned three children born of her womb and an ex-convict father who is fighting, in law, to be with them. The third litigant is the Department of Social Services, State of South Dakota. State in its conclusion, page 32 of its brief, advocates as follows: "State submits that the best interests of these children could only be served by snipping off any remaining ties to their birth father and allowing the children to live a normal, secure family life with a caring family." So there you have it: (a) A mother who doesn't give a whit, (b) a father who does and (c) the State attempting to sweep up the children into a vortex of sociological (as it envisions) perfection. But life isn't perfect. And parents do have rights to their children. These are described as a "fundamental liberty interest." Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960) the United States Supreme Court expressed:
In a series of decisions this court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.
Termination is the ultimate goodbye. It is a drastic remedy.
In deciding this case, it is axiomatic that we should review the statutes and decisions which are applicable. In part, SDCL 26-8A-21 requires:
If the child has been removed from the home and has been placed in temporary custody of the department of social services, the department shall make reasonable efforts to make it possible for the child to return to the home of the child's parents, guardian or custodian. (Emphasis supplied mine).
By its brief, State maintains no services would have been reasonable. To conclude, without any proof, that services would be unavailing is contrary to the above statute. Further, such a concept has been condemned by this Court in Matter of B.E., 287 N.W.2d 91 (S.D.1979). Justice Sabers' dissent is unsupported in law and is contrary to the germane statute and decisional law of this state. Department of Social Services could have contacted father (while he was in prison), checked on his attitude towards the children, advised him how they were getting along, and determined what reasonable efforts could be made. It chose not to do so; when the prison door slammed shut, the conclusion was, apparently, father loses his children. Said department could have checked into his likelihood of making parole, where he would go, whether he would work, and if so, where? Was there a chance of father reuniting with his children? Does he have a genuine interest in his children? Can he support them? Answers were unknown but the circumstances should have been explored by the DSS. We are born under one law, and to another we are bound. We are all a part of God's family. Humanity does not end with the clank of a steel door.[*]
In the Interest of A.D., 416 N.W.2d 264, 268 (S.D.1987), in a unanimous opinion, written by Circuit Judge McKeever, this Court expressed:
The court may also consider evidence of a parent's past conduct and present incarceration as guidelines in determining whether to terminate parental rights. In discussing these guidelines in People in Interest of T.H., supra, [396 N.W.2d 145 (S.D.1986) ] Justice Sabers quoted Justice Henderson's concurring opinion in Matter of A.M.L., 371 N.W.2d 358 (S.D.1985). There Justice Henderson indicated that the more enlightened rule followed today is that while parental rights should not be terminated for the sole reason of conviction of a crime or incarceration, the fact of incarceration may be considered along with other factors in determining *592 whether parental rights should be terminated. The other factors should include general fitness of the parent and the length of incarceration. (Emphasis supplied mine).
We have a developing body of law in this state, involving incarceration of a parent and its legal effect on custody of children. We should give authoritative expression to its development, as earlier expressed in the opening paragraph of this special writing.
My research reveals that at least nine other states hold that incarceration does not estop consideration of a parent obtaining custody. Matter of Juvenile Action No. S-624, 126 Ariz. 488, 616 P.2d 948, 950 (App.1980); People in Interest of M.C.C., 641 P.2d 306, 309 (Colo.App.1982); In re Juvenile Appeal, 187 Conn. 431, 446 A.2d 808 (1982); In re Randy Scott B., 511 A.2d 450, 455 (Me.1986); In re Staat, 287 Minn. 501, 178 N.W.2d 709 (1970); In re Interest of L.V., 240 Neb. 404, 482 N.W.2d 250, 260 (1992); Matter of Troy, 27 Or.App. 185, 555 P.2d 933 (1976); In re Frances, 505 A.2d 1380, 1385 (R.I.1986); In re Clark, 26 Wash.App. 832, 611 P.2d 1343, 1345 (1980). Reference is made to a case in South Dakota where a social worker worked out a case service plan for a mother in prison. People in Interest of C.L., 356 N.W.2d 476 (S.D. 1984).
Finally, there must be a finding of clear and convincing evidence to establish that termination of the father's rights were in the best interests of these three children. People in Interest of E.M., 466 N.W.2d 168, 172 (S.D.1991). No such evidence was produced in this case.
Undoubtedly, the father has been frustrated in visiting his children during his incarceration and these legal proceedings. He should be given a realistic opportunity to reassert his role as father and the DSS should extend "reasonable efforts" per SDCL 26-8A-21 and decisional law cited heretofore.
Finally, the writing of Justice Sabers reflects the children did not love the father nor did he love them. Such a statement is unsupported in the record. It is the sole opinion of Justice Sabers. As indicated earlier, mother sought and obtained a Protection Order. From August 6, 1990, and thereafter father was prohibited from contacting the minor children or the mother or visiting the abode of the children. By said Order, mother was vested with the children. Thereby, the social bonds were severed by judicial fiat. Under such judicial restraint, perhaps his love appeared weak and faint. But not so faint that he would abandon, without struggle, his children to the state. Geography can test the measure of love.
SABERS, Justice (dissenting).
At times, it is hard to vote to terminate parental rights to children. This is especially true when there is a showing that the parent is trying to be a good parent. It is even harder when there is a showing that the parent and children love each other.
In this case, father is a forty-five-year old Vietnamese refugee who was convicted of distribution of cocaine. At the time of arrest, he had $5,000 cash and substantial cocaine in his possession.
Father is a drug user and seller. Despite his conviction, which was based on a recorded conversation, he claims to be innocent of drug dealing. The trial court found that he was "fundamentally dishonest." At his age, he is not likely to change in time to help these children.
Father has been involved in prior child neglect proceedings in regard to two older children. He lost those children to the Department of Social Services.
Here, father and mother never married but became the parents of three illegitimate children. Father has only given mother $200 in support of these children since April of 1990.
There is no showing in this record that he is trying to be a good parent. There is not even a showing that he loves or even cares for his children, nor they for him.
The record does show that these children need love, attention, training and support and that they need it now. Although this record is poorly developed, it shows that these children are not likely to get the love, *593 attention, training and support that they need from him. In fact, his history indicates that his parental rights are a stumbling block to the children's pressing needs.
Under the least restrictive alternative thesis, the majority concludes that the Department of Social Services has not jumped through enough hoops. They would remand to do things over again which appears to me to be like "sending the troops down the hill, simply to march them up the hill again."
We are supposed to decide these cases based on the best interests of the children, not the parents. In re. S.W., 398 N.W.2d 136 (S.D.1986); People ex rel. C.L., 356 N.W.2d 476 (S.D.1984).
I vote for the children and I vote to affirm.
NOTES
[*] In his book DELIVERY OF JUSTICE, College of William and Mary Press, 1990, at page 322, Warren E. Burger, Chief Justice of the United States, 1969-1986 writes: "Collectively we take on a moral burden when we put a person behind walls and that burden is to give him or her, a chance to change. If we deny them that, we deny them status as human beings and to deny that is to diminish our own humanity and plant the seeds of anguish for ourselves."