July 1, 2020

**Supreme Court**

No. 2018-173-Appeal.
No. 2018-174-Appeal.
(16-4103-1)

In re Rylee A.                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2018-173-Appeal.
No. 2018-174-Appeal.
(16-4103-1)

In re Rylee A.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**  These consolidated appeals were heard by the Supreme Court by video conferencing on May 14, 2020, pursuant to an order directing the parties to appear and show cause why the issues raised in these appeals should not be summarily decided.[1]  The respondents, Krystal A. (Krystal) and Shane A. (Shane) (collectively respondents), each appeal from a decree entered in the Family Court terminating their parental rights to their daughter, Rylee A. (Rylee), who was born on October 28, 2016.[2]  Having carefully considered the parties' written and oral submissions and having reviewed the record, we are satisfied that cause has not been shown, and we proceed to decide the appeals at this time.  For the reasons stated in this opinion, we affirm the decree of the Family Court.

**Facts and Travel**

This case presents us with sad and disturbing facts surrounding the first forty days of infant Rylee's life.  The uncontroverted evidence was that this newborn suffered horrific injuries inflicted by physical child abuse.  After two hospitals and several tests and examinations conducted by medical child abuse experts, her injuries were diagnosed as a fractured right femur;

---

[1] The appeals were consolidated by an order of this Court entered on May 17, 2019.

[2] For the sake of privacy, we will refer to the family members by their first names.

posterior fractures to three of her ribs; scratches on her right cheek; and bruising of the palm and fingers of her right hand, left flank, left shin, left thigh, and left forearm.

On December 7, 2016, five-week-old Rylee was taken to Kent Hospital by her parents and transferred by ambulance to Hasbro Children's Hospital (Hasbro) with a fractured femur. After a physical examination revealed signs of suspected child abuse, her treating physician, Adebimpe Adewusi, M.D., under the supervision of Brett Slingsby, M.D., filed a Physician's Report of Examination (PRE) requesting that Rylee be placed in state custody. A seventy-two-hour hold was then placed on the infant, and Hasbro notified the state Department of Children, Youth, and Families of suspected child abuse. Rylee remained at Hasbro, and two days later, DCYF filed a neglect and abuse petition in the Family Court in accordance with G.L. 1956 § 40-11-7.[3] DCYF was granted temporary custody of Rylee, with discretion as to her placement. A no-contact order also was entered, prohibiting respondents from having contact with Rylee. DCYF filed a second petition in the Family Court on December 30, 2016, seeking to involuntarily terminate the parental rights of respondents in accordance with G.L. 1956 § 15-7-7(a)(2)(ii).[4] The petitions were merged and proceeded to trial. The trial commenced on

---

[3] Both parents have been convicted of cruelty or neglect in the Family Court in violation of G.L. 1956 § 11-9-5. Krystal pled nolo contendere to the cruelty or neglect charge and received a one-year suspended sentence, with three years of probation. While her appeal to the Supreme Court in the present case was pending, Krystal filed an application for postconviction relief in relation to her criminal conviction. As of this opinion, that application remains pending. Shane also pled nolo contendere to the cruelty or neglect charge, and received a three-year sentence, with eighteen months to serve and eighteen months suspended, with probation.

[4] General Laws 1956 § 15-7-7(a)(2)(ii), entitled "Termination of parental rights[,]" states, in pertinent part:

> "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to

September 7, 2017, and concluded in December of that year. We proceed to recount the relevant trial testimony in some detail.

### Dr. Brett Slingsby

Doctor Slingsby, an expert in the area of general pediatrics and child abuse pediatrics, testified that, on December 7, 2016, he was the attending child abuse pediatrician and the supervising physician for Dr. Adewusi.[5] Doctor Slingsby testified that Dr. Adewusi conducted a full medical examination of Rylee and prepared the initial medical report. Doctor Slingsby testified that he and Dr. Adewusi discussed Rylee's medical history, physical examination, assessment, and treatment plan, and that he reviewed, edited, and gave signed approval of Dr. Adewusi's medical report.

Doctor Slingsby testified that, on December 8, he examined Rylee and observed scratches on her right cheek and bruises on the palm and fingers of her right hand, left shin, left thigh, and left forearm. Doctor Slingsby further testified that the bruises on her thigh were "patterned" bruises, which are generally caused by an object and "not something we see from falls or babies bumping into things." Doctor Slingsby stated that the patterned bruising made him "especially

---

notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

"* * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

"* * *

"(ii) Conduct toward any child of a cruel or abusive nature[.]" Section 15-7-7(a)(2)(ii).

[5] Doctor Adewusi did not testify at trial. The record indicates that Dr. Adewusi no longer works at Hasbro and has since moved out of state.

- 3 -

worried[,]" because "[a] healthy infant should not get any bruises with normal handling and normal care."

Doctor Slingsby testified that a skeletal survey—an x-ray of every bone in the body—revealed a fracture of Rylee's right femur. More specifically, Dr. Slingsby testified, Rylee suffered a transverse fracture of the femur with a little bit of oblique, meaning that the injury was caused by force "directly across th[e] bone, * * * either from the side or from on top," which caused the "break to go clear between that bone[,]" as well as force with a "twisting mechanism[.]" Doctor Slingsby testified that such a fracture would not otherwise occur in the ordinary course of caring for an infant and would be noticeable to any caretaker because any manipulation of the leg would be painful to the child. Doctor Slingsby testified that such a fracture could not have been caused by an adult rolling onto Rylee's leg while sleeping or by another child jumping on her leg. Doctor Slingsby also noted that respondents did not mention either of those scenarios as a possible cause of Rylee's injuries when she was admitted to Hasbro on December 7, 2016.

Doctor Slingsby next testified that he and Dr. Adewusi conducted a follow-up skeletal survey of Rylee on December 21, which revealed posterior rib fractures to three of Rylee's ribs. Doctor Slingsby testified that the rib fractures had occurred at least seven days before the December 21 skeletal survey. Doctor Slingsby further testified that "[t]here was not any medical intervention done with Rylee that would have resulted in rib fractures[,]" and that "[p]osterior rib fractures would not be expected to be from normal care or during care in the hospital."[6]

---

[6] Although the posterior rib fractures were not detected in the initial skeletal survey on December 7, Dr. Slingsby explained that it is common for rib fractures to go undetected because the bones are small. According to Dr. Slingsby, he conducts skeletal surveys of infants "because picking up fractures, even rib fractures, on an exam is really, really hard."

According to Dr. Slingsby, the most common mechanism for causing posterior rib fractures is compression or squeezing of the rib cage. He explained that posterior rib fractures could not be caused by, for example, a normal hug or a car seat. Instead, "a significant event outside of the realm of normal care" is required, and "someone who is doing that would know that they were applying too much force."

Doctor Slingsby testified that a series of biological and genetic tests were conducted on Rylee. The test results were normal. In light of all the test results, physical examinations, and laboratory studies, Dr. Slingsby testified, there was no biological or genetic condition, or any other medical cause, to explain Rylee's injuries. Doctor Slingsby concluded, to a reasonable degree of medical certainty, that the bruises and fractures of Rylee's posterior ribs and femur were inflicted by physical child abuse.

**Joshua Cottle**

Joshua Cottle, a child protective investigator for DCYF, testified that he was assigned to Rylee's case on December 7, 2016. He testified that he conducted a DCYF history check of respondents, which revealed that the father, Shane, had been red-flagged in the DCYF system as a convicted sex offender and "perpetrator in multiple families." Mr. Cottle testified that he reviewed the PRE and contacted Dr. Adewusi. After speaking with Dr. Adewusi, Cottle contacted respondents to set up an interview.

On December 7, 2016, Cottle interviewed respondents at the DCYF office. The interviews were conducted separately; Krystal was interviewed first. According to Cottle, she was very emotional during the interview, and she told Cottle that Shane, her husband, did not live in the home and that she was Rylee's sole caretaker. Krystal indicated to Cottle that she was struggling with frustration due to lack of sleep, but she denied mishandling the child. Krystal

was unable to provide an explanation for Rylee's injuries. Krystal also denied ever having observed anyone mishandle Rylee.

Mr. Cottle then interviewed Shane, who appeared calm and collected. Mr. Cottle indicated that Shane repeated most of what Krystal had told him—that Krystal was Rylee's only caretaker and that he had no explanation for Rylee's injuries. According to Cottle, Shane told him that he was never with Rylee unsupervised and that Krystal was always present when he was in the home. Mr. Cottle also testified that Shane stated that he would always leave the home at night and return to his residence.[7]

### Officer Maldonado

Officer Samuel Maldonado of the West Greenwich Police Department testified that he was assigned to investigate Rylee's case on December 8, 2016. Officer Maldonado testified that he interviewed respondents on December 8 at the police station. He further testified that he, along with one Captain Barone of the West Greenwich Police Department, interviewed Krystal first. During that interview, she agreed to allow the officers to take photographs of both her and her residence. Officer Maldonado testified that he, Captain Barone, and respondents then proceeded to Krystal's residence. After the photographs were taken, they returned to the police station and conducted separate interviews of respondents. Officer Maldonado testified that he interviewed Krystal. The interview was video recorded and was admitted as an exhibit at trial.

During the interview, Krystal stated that she was Rylee's primary caregiver and that she did not employ a babysitter. She also informed Officer Maldonado that only Shane, her mother, and Shane's mother had access to the infant, and that their contact was always supervised.

---

[7] The record reveals that Shane is a registered sex offender with a different address of residence. The record also reveals that Shane did not use Krystal's residence as his registered address because respondents did not want Krystal's landlord to know about Shane's status as a registered sex offender.

According to Officer Maldonado, Krystal admitted, however, that Shane would stay at her house overnight, and that she had initially lied about that because she did not want Shane to get into trouble.

Concerning Rylee's injuries, Krystal told Officer Maldonado that she had "no idea how it happened." Krystal did, however, proffer possible explanations for the injuries, including the car seat, the carrier, while changing her diaper, and rolling on top of Rylee while they were sleeping. Officer Maldonado also testified that Krystal mentioned that a child had been jumping on the bed where Rylee was sleeping. Officer Maldonado testified that he ultimately determined that none of Krystal's possible explanations for the injuries were plausible. He further testified that he spoke with Dr. Adewusi, who informed him that none of Krystal's explanations for Rylee's injuries were plausible. According to Officer Maldonado, Krystal insisted throughout the entire interview that she was always with Rylee and never left her unsupervised. Finally, Officer Maldonado testified that, as a result of the investigation, respondents were arrested and charged with child cruelty or neglect.

**Sergeant Brown**

Sergeant Richard Brown of the West Greenwich Police Department testified that he participated in the interviews of both Krystal and Shane at the police station on December 8, 2016. Concerning the interview with Shane, Sgt. Brown testified that Shane told him that respondents were Rylee's only caretakers and the only people with access to the infant, who was never left unsupervised with anyone else. Sergeant Brown also testified that, during the interview with Krystal, she admitted that Shane would stay overnight at her house even though it was a violation of his sex-offender registration status for him to do so.

Sergeant Brown testified that, when asked about Rylee's injuries, and specifically about the fracture of her right femur, Shane stated that he thought it was possibly a spider bite. Shane also proffered, for the first time, the possibility that a three-year-old child may have fallen on Rylee while they were on the bed. Sergeant Brown testified that he rejected that scenario as a possible explanation because, "based on what we received from the doctor, some other research that we conducted to make us a little bit more knowledgeable about these type[s] of injuries, it's not consistent with a child falling on another child. It's too much energy that needs to be inflicted." Moreover, according to Sgt. Brown, he did not recall Krystal mentioning a three-year-old jumping on the bed during her interview, nor did she provide any other possible explanation for Rylee's injuries.

**Pamela McLaughlin**

Pamela McLaughlin, a DCYF caseworker, testified that she was assigned to Rylee's case on December 13, 2016, after DCYF obtained temporary custody of Rylee. Ms. McLaughlin testified that she spoke with Krystal on the phone a few times and met with respondents and their attorneys after respondents were arrested for alleged child abuse.

Ms. McLaughlin testified that she visited Rylee on multiple occasions in her preadoptive home and that Rylee was doing very well; Rylee had bonded with her foster family and had not suffered any broken bones since being removed from the custody of respondents. Ms. McLaughlin also testified that she believed that it was in Rylee's best interest to be adopted by her foster family.

**Shane**

Shane was called to testify at trial, first by DCYF, and again during his case-in-chief. Shane testified that, in addition to Rylee, he has a seven-year-old daughter, Abigail, with whom

he does not have a relationship—he does not visit her, does not know where she lives, and does not support her financially. Shane further testified that he was convicted of first-degree child molestation in 2004 and received a fifteen-year sentence, with four years to serve. Shane stated that, at the time of trial in the case at bar, he was on probation for the first-degree child molestation conviction and was a level-one registered sex offender.

Shane testified that, on December 7, 2016, he, Krystal, and Rylee went to Krystal's mother's house. When they arrived, Rylee was sleeping, and he took her out of her carrier and placed her on the bed in Krystal's mother's bedroom and went outside with Krystal and her mother to have a cigarette. Shane testified that Krystal's niece, Maddison, also was sleeping on the bed. While they were outside, Shane testified, he heard crying from the inside of the house. He testified that he rushed into the bedroom and found Rylee crying and Maddison jumping on the bed next to her. However, he "did not see her jump on Rylee[.]" Shane testified that he thought Rylee was crying because her diaper needed to be changed. While he was changing her diaper, however, he noticed a red mark on Rylee's leg, which, at the time, he thought was a spider bite. Shane called for Krystal, and they decided to take Rylee to the hospital. When Rylee was subsequently transferred to Hasbro, he told Dr. Adewusi that Rylee's leg was swollen and red and that it looked like a spider bite. He also testified that he did not notice any bruises on Rylee and that he did not know how the bruises or the fractures of Rylee's ribs and femur occurred.

Shane testified that he did not notice anything different about Rylee in the days preceding these injuries. He also testified that he and Krystal were Rylee's only caretakers and that he had been with Rylee and Krystal every day since Rylee's birth. Shane did testify, however, that they would sometimes leave Rylee with a family member when they went outside to have a cigarette.

And, according to Shane, the only time Krystal would leave him alone with Rylee was when she would go outside to smoke. On cross-examination, however, Shane admitted that, on multiple occasions, he had taken the newborn infant to Dunkin' Donuts alone in his truck and that each trip lasted about forty-five minutes.

**Krystal**

Krystal also testified at trial. Krystal testified that she was with Rylee at all times other than when she showered or went outside to smoke a cigarette. When she was not watching Rylee, Krystal testified, Shane would watch her. Krystal also testified that, contrary to Sgt. Brown's testimony, Shane never stayed at her house overnight.

In the days leading up to December 7, 2016, Krystal testified that Rylee was "fussy." She stated that Rylee would cry when she put her down and would continue to cry until she picked her up. Krystal believed that it was due to a growth spurt. Krystal testified that, on December 7, 2016, Shane called her into her mother's bedroom and asked her "if that bump on Rylee's leg was normal." She testified that she became nervous because Rylee's leg "did not [look] right." Krystal further testified that respondents decided to take Rylee to Kent Hospital. At Kent, x-rays were taken of Rylee's right leg, which revealed a fractured femur. Rylee was then placed on a stretcher and taken to Hasbro by ambulance. Krystal testified that, at Hasbro, she spoke with Dr. Adewusi about the cause of Rylee's injuries. According to Krystal, Dr. Adewusi told her that "somebody snapped her leg like a chicken bone[.]" Krystal testified that she asked Dr. Adewusi if one of her mother's dogs could have jumped on Rylee or if she could have rolled on top of Rylee while she was sleeping. Dr. Adewusi immediately discounted both scenarios as possible causes of Rylee's injuries. Krystal did not offer any other possible reasons for Rylee's injuries.

According to Krystal, Shane did not mention that Maddison had been jumping on the bed with Rylee until after they had left Hasbro and after they had met with Cottle, and he did not say that Maddison was jumping on Rylee, nor did he say that he saw Maddison do so. However, Krystal described Maddison as "a very energetic baby[,]" and she would get "extra excited" when she was with Rylee.

Krystal testified that Rylee would sleep in her bed, but that she did not believe that Rylee's injuries were caused by her rolling onto her. According to Krystal, she never rolled over Rylee, and Rylee had never woken up with a piercing cry.

### Dr. Joanne Doucette

Joanne Doucette, Ed.D., a licensed psychologist, testified on behalf of respondents; the Family Court justice considered her to be an expert in the area of psychology. Doctor Doucette testified that Krystal hired her to conduct a risk assessment of respondents in order to identify any risk factors for physical child abuse, as well as to conduct a sex-offender risk assessment of Shane.

Doctor Doucette testified that she met with respondents and prepared a separate report for each of them. Doctor Doucette testified that, in the course of making her assessments and preparing her reports, she relied on certain documents, which she provided to the court at trial. The record is unclear, however, as to which documents Dr. Doucette relied upon in preparing her report because she did not receive some of the documents that were presented until after the report was completed.

Doctor Doucette determined that Krystal no longer suffered from bipolar disorder, which she had been diagnosed with previously. Doctor Doucette further testified that respondents told her that, on December 7, 2016, they were hiking with Rylee, who was being carried in a baby

carrier. She further testified that respondents told her that, when they arrived home after hiking, they changed Rylee's diaper and noticed a red mark that they described as a spider or tick bite, which prompted them to take Rylee to the hospital. Doctor Doucette's reports, however, did not mention that respondents went on a hike with Rylee on December 7.

Doctor Doucette next testified that she assessed Shane for anger, substance abuse, and sex offender recidivism. Doctor Doucette testified that Shane provided her with some information, including hospital records and arrest reports, but the record is unclear as to what documents Dr. Doucette relied upon in preparing her report. Doctor Doucette testified that, although Shane informed her of his personal history as a parent, he failed to mention that he also had another child, Abigail.

Doctor Doucette concluded that, based on the testing and the interviews, neither Krystal nor Shane was at risk for perpetrating physical child abuse and that Shane was "a very low risk for reoffending as a sex offender."

**The Family Court Decision**

On February 8, 2018, the Family Court justice issued a comprehensive seventy-two-page written decision in which she thoroughly reviewed the trial testimony and exhibits and made thirty-four findings of fact. The Family Court justice found that respondents "were the only people who had access, care and control of Rylee during the period of time that the bruises and fractures and injuries were inflicted" and that respondents were unable to provide a "plausible explanation" as to how the injuries occurred. The Family Court justice flatly rejected respondents' suggestion that Maddison *could* have been the cause of Rylee's injuries. She reasoned that neither Shane nor Krystal saw Maddison jump on Rylee. The Family Court justice further reasoned that respondents did not mention the possibility that Maddison may have caused

- 12 -

Rylee's injuries to anyone at Hasbro or to DCYF. The Family Court justice noted that Shane did not even tell Krystal that Maddison may have jumped on Rylee's leg until after they left Hasbro without their daughter.

The Family Court justice also found the testimony of Krystal and Shane not to be credible. She first acknowledged that "the court has had a chance to observe both Mother and Father; their demeanor, their veracity, and their testimony[,]" and declared that the "court is not impressed with any of it." She found Shane's testimony to be "deceptive and manipulative" and Krystal's to be "evasive, untruthful, and also selective." The Family Court justice also gave "no weight or consideration to the reports and opinion expressed by Dr. Doucette[,]" reasoning that "her information is incomplete, inaccurate, and illogical based on all of the information presented at trial." By contrast, the Family Court justice accorded "great weight" to the testimony of Dr. Slingsby that, "in his expert opinion, the injuries sustained by Rylee [A.] were the result of physical child abuse."

The Family Court justice found that DCYF proved by clear and convincing evidence that respondents were "unfit by reason of conduct or conditions seriously detrimental to the child, in that [respondents] ha[ve] committed or allowed to be committed, conduct toward [their] child, Rylee [A.] of a cruel and abusive nature." Accordingly, the Family Court justice concluded that it was "in the best interest of the minor child, Rylee [A.], that the parental rights of [respondents] be terminated based on the finding of unfitness." The petition to terminate respondents' parental rights under § 15-7-7(a)(2)(ii) was granted, and a final decree entered on February 16, 2018. The respondents timely appealed.

## Standard of Review

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019) (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451). "Such findings must be supported by clear and convincing evidence." *Id.*

## Analysis

Before this Court, respondents argue that the Family Court justice erred in (1) admitting into evidence the medical report prepared by Dr. Adewusi; and (2) holding that DCYF had proven by clear and convincing evidence that respondents were unfit parents. After carefully examining the record from the Family Court and the arguments of the parties, we conclude that legally competent evidence exists to support the findings of the Family Court justice, by clear and convincing evidence.

## Evidentiary Rulings

During Dr. Slingsby's testimony, DCYF offered as a full exhibit the medical report that was prepared after Rylee was admitted to Hasbro. The respondents objected on hearsay grounds. DCYF countered that the medical report was admissible under Rules 803(4) and 803(6) of the Rhode Island Rules of Evidence. The Family Court justice admitted the report as a full exhibit, reasoning that Dr. Slingsby's testimony established that "he is at the very least a co-author and the supervisor of the report." On appeal, respondents aver that the Family Court justice erred in

introducing into evidence the medical report prepared by Dr. Adewusi because the evidence constituted inadmissible hearsay.  We disagree.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." R.I. R. Evid. 801(c). Hearsay is inadmissible at trial unless it qualifies under one of the several hearsay exceptions. *State v. Brown*, 9 A.3d 1240, 1247 (R.I. 2010).  "It is well established that 'the admission of a statement under an exception to the hearsay rule is within the sound discretion of the trial justice and shall not be overturned unless clearly erroneous.'" *In re Izabella G.*, 196 A.3d 736, 742 (R.I. 2018) (brackets omitted) (quoting *State v. Lynch*, 854 A.2d 1022, 1038 (R.I. 2004)).

Rhode Island recognizes that Rule 803(4) provides an exception for statements made for purposes of medical diagnosis or treatment, including information about past or present conditions, history, and causation.[8] R.I. R. Evid. 803(4); *see* Advisory Committee Note to R.I. R. Evid. 803(4).  The proponent of the evidence must lay a proper foundation establishing that the statements in the record were made for purposes of medical diagnosis or treatment. *State v. Watkins*, 92 A.3d 172, 188 (R.I. 2014).  The rationale behind the medical-diagnosis exception is that "a person will presumably be truthful to a physician from whom he expects to receive medical attention." *State v. Pina*, 455 A.2d 313, 315 (R.I. 1983).  Admissibility, however, "hinges on whether what has been related by the patient will assist or is helpful in the diagnosis

---

[8] Rule 803(4) of the Rhode Island Rules of Evidence provides:

> "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, but not including statements made to a physician consulted solely for the purposes of preparing for litigation or obtaining testimony for trial."

or treatment of the patient's ailment." *In re Jessica C.*, 690 A.2d 1357, 1363 (R.I. 1997) (brackets omitted) (quoting *State v. Ucero*, 450 A.2d 809, 815 (R.I. 1982)). Although this Court has never been hypercritical in our interpretation or application of Rule 803(4), *In re Emilee K.*, 153 A.3d 487, 495 (R.I. 2017), "when the statements made are merely to assign fault or to narrate details that are not connected with diagnosis or treatment, they are inadmissible hearsay if they do not fall within any other hearsay exception." *State v. Veluzat*, 578 A.2d 93, 96 (R.I. 1990).

In our opinion, the Family Court justice did not err in admitting the medical report into evidence. The record discloses that the information and statements contained in the medical report directly pertained to the medical diagnosis and treatment of Rylee. Doctor Slingsby testified that obtaining a medical history for an infant patient is critical to making an accurate medical diagnosis, including distinguishing between accidents and abuse as the cause of the patient's injuries. Doctors Adewusi and Slingsby conducted multiple tests and examinations and interviewed respondents to determine the extent and cause of Rylee's injuries. Moreover, the state established that Dr. Slingsby, who testified at trial, had personal knowledge of all the information contained in the medical report. The medical report stated that Dr. Slingsby had "discussed the history, physical exam, assessment and plan" with Dr. Adewusi, that he examined Rylee separately, and that he "reviewed the laboratory studies, reviewed the radiographic images, and reviewed the photodocumentation." The medical report also stated: "I am in agreement with the above note." Doctor Slingsby, by signing the medical report, attested to the information it contained. We therefore conclude that there was a proper foundation establishing that the statements and information contained in the medical report pertained to the medical diagnosis and treatment of Rylee. Accordingly, we conclude that the Family Court justice did

not abuse her discretion in admitting the medical report into evidence because it qualifies under the medical-diagnosis exception to the hearsay rule.[9]

## Termination of Parental Rights

We turn to respondents' appeals from the decree terminating their parental rights. The respondents argue that the Family Court justice erred in finding, by clear and convincing evidence, that both Shane and Krystal were unfit parents "by reason of conduct or conditions seriously detrimental to the child," in that they committed, or allowed to be committed, conduct toward their child "of a cruel and abusive nature[,]" and that it was in the child's best interest that respondents' parental rights be terminated. We disagree and conclude that legally competent evidence exists to support the findings of the Family Court justice.

## Parental Fitness

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Violet G.*, 212 A.3d at 166 (quoting *In re Amiah P.*, 54 A.3d at 451). Given the drastic and irreversible nature of a termination of parental rights decree, "the right to due process requires that the state support its allegations by clear and convincing evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451).

"Before terminating a parent's rights to his or her child, the Family Court justice must find that the parent is unfit." *In re Violet G.*, 212 A.3d at 166 (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451). A parent is deemed unfit "by reason of conduct or conditions seriously detrimental to the child[,]" § 15-7-7(a)(2), including when the parent has exhibited

---

[9] Because we conclude that the medical report was admissible under Rule 803(4), the medical-diagnosis exception, we need not address the admissibility of the evidence under Rule 803(6).

"[c]onduct toward any child of a cruel or abusive nature[.]" Section 15-7-7(a)(2)(ii).[10]   If a Family Court justice determines that a parent is unfit under § 15-7-7, "the best interests of the child outweigh all other considerations." *In re Violet G.*, 212 A.3d at 166 (quoting *In re Amiah P.*, 54 A.3d at 451).  A Family Court justice's finding of parental unfitness under § 15-7-7(a)(2) is "entitled to great weight and will not be disturbed on appeal unless it is clearly wrong or the trial justice misconceived or overlooked material evidence." *In re Brian A.T.*, 146 A.3d 866, 873 (R.I. 2016) (brackets omitted) (quoting *In re Jennifer R.*, 667 A.2d 535, 536 (R.I. 1995)).

In this case, the Family Court justice terminated the parental rights of respondents based on her conclusion that the state had established by clear and convincing evidence that the parents were unfit "by reason of conduct or conditions seriously detrimental to the child, in that [respondents] ha[ve] committed or allowed to be committed, conduct toward [their] child, Rylee [A.] of a cruel and abusive nature."  The Family Court justice reasoned that there was no "plausible explanation" other than that respondents "caused or allowed these injuries to be caused to their child."  In arriving at her decision, the Family Court justice placed "great weight on the expert medical testimony and exhibits presented from Dr. Slingsby that in his expert opinion, the injuries sustained by Rylee [A.] were the result of physical child abuse."  And, while Dr. Slingsby acknowledged that Rylee's injuries "could" have been inflicted at the same time, the trial testimony established that the injuries were caused by different mechanisms.  Doctor

---

[10] Certain subsections of the Termination of Parental Rights statute, including § 15-7-7(a)(1), (a)(2)(i), and (a)(2)(iii), require the petitioning agency, as a condition precedent to termination, to "satisfy the trial court by clear and convincing evidence that 'reasonable efforts' were undertaken to 'encourage and strengthen the parental relationship.'" *In re Nicole B.*, 703 A.2d 612, 617 (R.I. 1997) (quoting § 15-7-7(b)(1)).  "In other words[,] the agency, here DCYF, must satisfy the trial justice that reunification of the family was attempted in good faith." *Id.*  When, as here, the termination of parental rights petition alleges parental conduct of a "cruel or abusive nature" under § 15-7-7(a)(2)(ii), no such requirement exists. *See id.*  Because the termination petitions filed against respondents allege just that, this case does not present the situation in which the state was required to undertake reasonable efforts at reunification.

Slingsby explained that the mechanism required to cause a femur fracture is different from the mechanism required to cause posterior rib fractures.

The respondents argue that the Family Court justice erred in finding that there was clear and convincing evidence that respondents exhibited conduct toward Rylee of a cruel or abusive nature. Specifically, respondents argue that the Family Court justice erred because Dr. Adewusi did not testify at trial and therefore was not subject to cross-examination, in violation of their due process rights. The respondents do not challenge the well-established principle that the Sixth Amendment to the United States Constitution does not extend the right of confrontation to noncriminal proceedings. *See, e.g.*, *In re James A.*, 505 A.2d 1386, 1390 (R.I. 1986). Rather, respondents argue that, *in light of the facts and circumstances of this case*, due process required that respondents be afforded the opportunity to cross-examine Dr. Adewusi. The respondents point to our decision in *In re Adrina T.*, 162 A.3d 658 (R.I. 2017), contending that this Court deemed the medical opinion of Dr. Adewusi to be unreliable based on conflicting medical testimony. The respondents also argue that the Family Court justice overlooked or misconceived material evidence concerning the testimony of Dr. Slingsby.

In *In re Adrina T.*, we vacated a Family Court decree terminating the parental rights of the respondent mother and held that the evidence presented was insufficient to permit a reasonable inference to be drawn that the mother abused and neglected her child. *In re Adrina T.*, 162 A.3d at 670. We reasoned that there was conflicting medical evidence presented at trial— including testimony given by Dr. Adewusi, who had also examined the child in that case—that "left it unclear whether Adrina's injury was inflicted as a result of abuse or was merely accidental in nature." *Id.* Our conclusion was buttressed by the fact that the respondent mother was not present when the child was injured. *Id.* In sum, we determined that "the findings of the

trial justice * * * [we]re not supported by sufficient legally competent evidence and, therefore, constitute[d] reversible error." *Id.*

The respondents' reliance on our decision in *In re Adrina T.* is misplaced. This Court did not call into question the reliability or credibility of Dr. Adewusi's medical testimony; rather, we merely acknowledged that the record contained inconsistencies concerning the medical testimony presented at trial that were overlooked by the Family Court justice. *See In re Adrina T.*, 162 A.3d at 670. We therefore reject respondents' argument.

We next turn to respondents' argument that the Family Court justice overlooked or misconceived material evidence concerning Dr. Slingsby's testimony that the injuries *could* have occurred at the same time, and that Dr. Slingsby "was unable to rule out the possibility that Rylee's injuries were caused by means other than parental abuse." The respondents argue that there is no evidence in the record establishing the cause of Rylee's injuries.

In *In re Frances*, 505 A.2d 1380 (R.I. 1986), this Court affirmed a termination of parental rights decree where the mother claimed ignorance of the cause of the child's injuries. *In re Frances*, 505 A.2d at 1385. We reasoned that the "evidence established that she was the primary care giver who at one point denied leaving the children with anyone and at another time said she often left the child with relatives." *Id.* at 1384. We further reasoned that the injuries were in various stages of healing, and that the mother was unable to provide an adequate explanation for those injuries. *Id.* Thus, we concluded that "[i]t was reasonable for the trial justice to conclude * * * that a loving, caring parent would have known the source of the injuries and would have reported this information to physicians or to the police if she had not caused them herself or permitted them to happen." *Id.* at 1385.

Our decision in *In re Chester J.*, 754 A.2d 772 (R.I. 2000), also is instructive. There, the parents were both the primary caregivers for their then-seven-month-old infant, who sustained "horrific" injuries—including fractures of his ribs, tibia, and radius—"over a sustained period." *In re Chester J.*, 754 A.2d at 774, 777, 778. The parents were unable or unwilling to provide an explanation for the injuries. *Id.* at 777. The Family Court justice terminated the parental rights of the respondents, finding that either parent, or both parents, were responsible and that the respondents "expressed complete and total ignorance of how the child's horrific injuries were inflicted." *Id.* at 776. This Court affirmed the termination of parental rights decree, declaring that the state is not required to prove which parents *actually* inflicted the abuse against the child and that "both the quantum and the obscene nature of the abuse was so overwhelming that the trial justice could not ignore the reasonable inferences to be drawn from the evidence." *Id.* at 777-78; *see In re Kristopher J.*, 115 A.3d 965, 971 (R.I. 2015) ("The trial justice's finding that the respondent caused his daughter's injuries was certainly reasonable, based on the clear and convincing evidence that he was the sole caretaker at the time of the fatal injuries; therefore, a finding that he violated § 15-7-7(a)(2)(ii) was warranted, and the termination of the respondent's parental rights to his son * * * logically followed.").

In this case, the reasonable inferences to be drawn from the evidence support the Family Court justice's finding that there was clear and convincing evidence of physical child abuse. The respondents acknowledged that they were Rylee's only caregivers, did not utilize a babysitter, and never left Rylee unsupervised with anyone else. Moreover, while Dr. Slingsby acknowledged that Rylee's injuries "could" have been inflicted at the same time, it was his unequivocal opinion that the injuries were inflicted by different mechanisms, indicating that they were not inflicted at the same time or by a single blow. The law of evidence is concerned with

positivities and probabilities, not possibilities. If the opinions offered by the expert witness are given "with the requisite degree of positiveness, 'his or her testimony is admissible and issues relative to the weight of the evidence are left to the fact-finder.'" *Riley v. Stone*, 900 A.2d 1087, 1092 (R.I. 2006) (quoting *Morra v. Harrop*, 791 A.2d 472, 477 (R.I. 2002)).

Additionally, respondents were found to be untruthful about certain facts at various times—including whether Shane spent the night at Krystal's house and whether he took Rylee to Dunkin' Donuts alone in his truck—and that respondents were unwilling or unable to provide an explanation for Rylee's injuries. Further, the after-the-fact suggestion that little Maddison may have jumped on Rylee is unfounded. When Rylee was transported to Hasbro on December 7, 2016, the storyline was a spider bite. The respondents did not tell anyone—nurses, doctors, or staff—about the possibility that Maddison may have jumped on Rylee. Nor did they tell that to DCYF when Cottle interviewed them later that same night. Shane did not even mention the possibility that Maddison jumped on Rylee until respondents left Hasbro on December 7, 2016, and neither Krystal nor Shane followed up in that regard with the hospital staff or Cottle.

Finally, Krystal argues that the Family Court justice overlooked or misconceived the video of her interview with police, because, according to Krystal, the video showed that Krystal was cooperative and consumed with grief, horror, and yearning to be reunited with her child. We reject this argument. The video was admitted into evidence as an exhibit, and the Family Court justice indicated that she would watch it. The video was referenced in her decision as part of the exhibits admitted at trial. The fact that the Family Court justice did not otherwise expressly mention the video in her decision is of no moment. We are not persuaded that the probative value of the video, if any, constitutes reversible error, especially in light of the fact that

the Family Court justice had the benefit of observing Krystal in the courtroom and on the witness stand.

Simply put, there is no countervailing evidence in the record before us to support the inference that Rylee's injuries were inflicted by anything other than physical child abuse, as reflected by patterned bruising, posterior rib fractures, and a transverse fracture of the right femur. The Family Court justice's finding that respondents are unfit parents by reason of conduct or conditions seriously detrimental to Rylee, in that they either committed or allowed conduct toward Rylee of a cruel and abusive nature, was supported by clear and convincing evidence.

### Best Interest of the Child

After a determination of parental unfitness, the Court's analysis shifts to the overarching issue of the best interests of the child, which outweighs all other considerations. *In re Violet G.*, 212 A.3d at 167. A determination as to the best interests of the child is based on "the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." *In re Christopher B.*, 823 A.2d 301, 317 (R.I. 2003) (quoting *In re Stephanie*, 456 A.2d 268, 271 (R.I. 1983)).

In the case at bar, the Family Court justice determined that "it is in the best interest of the minor child, Rylee[,]" that the parental rights of respondents "be terminated based on the finding of unfitness." We are mindful of the "significance of severing the bond between parent and child[.]" *In re Violet G.*, 212 A.3d at 168 (quoting *In re Alexis L.*, 972 A.2d 159, 170 (R.I. 2009)). But we nonetheless are satisfied that the Family Court justice appropriately determined that the termination of respondents' parental rights is in the best interest of the child. *See In re*

*Alexis L.*, 972 A.2d at 170 (explaining that "[a]lthough this Court is ever cognizant of the significance of severing the bond between parent and child, it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow").

**Conclusion**

Given the finality of a termination of parental rights decree, we do not reach these conclusions lightly. However, based on the significant amount of material evidence in the record and the Family Court justice's findings concerning the credibility of the witnesses, we affirm the Family Court decision. The findings of the Family Court justice were based on clear and convincing evidence and were not clearly wrong. Nor did she overlook or misconceive material evidence in arriving at this difficult decision. Accordingly, we affirm the Family Court decree terminating the respondents' parental rights to their daughter, Rylee. The papers may be returned to the Family Court.

Justice Indeglia participated in the decision but retired before its publication.


## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Rylee A. |
| **Case Number** | No. 2018-173-Appeal.<br>No. 2018-174-Appeal.<br>(16-4103-1) |
| **Date Opinion Filed** | July 1, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Associate Justice Maureen McKenna Goldberg |
| **Judicial Officer from Lower Court** | Lynch Bernard, Karen |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Dianne L. Leyden<br>Department of Children Youth and Families<br><br>Bruce J. Katz<br>Court Appointed Special Advocate |
| | For Respondents:<br><br>Megan F. Jackson<br>Office of the Public Defender<br><br>Susan M. Fink, Esq. |